ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RICHARD C. WOJEWODZKI, | : | CIVIL ACTION NO. 1:CV 01-285 |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE SYLVIA H. RAMBO |
| | : | |
| CONSOLIDATED FREIGHTWAYS, INC., | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

*M. G. Smyser*

FILED APR 0 1 2002

HARRISBURG, PA DEPUTY C.

### CONSOLIDATED FREIGHTWAYS CORPORATION'S
### REPLY TO PLAINTIFF'S MEMORANDUM OF LAW IN
### OPPOSITION TO CF'S MOTION FOR SUMMARY JUDGMENT

Consolidated Freightways Corporation of Delaware (incorrectly named in the Complaint as Consolidated Freightways, Inc.) (hereinafter "CF"), through its attorneys, hereby submits its Reply to Plaintiff's Memorandum of Law in Opposition to CF's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56(b).

### I.      INTRODUCTION

Plaintiff alleges that CF demoted him on August 27, 1999, because of his age. Compl. ¶¶ 11, 15. Plaintiff also alleges that CF reassigned his former duties to "substantially younger persons." Compl. ¶ 13. Based on these allegations, Plaintiff asserts claims under the Age Discrimination in Employment Act ("ADEA"). On February 19, 2002, CF filed its Motion for Summary Judgment, and on March 15, 2002, Plaintiff filed his opposition brief.

1-HA/99141.2

## II.    ARGUMENT

### A.    Plaintiff Cannot Establish A *Prima Facie* Case Under The ADEA.

#### 1.    Plaintiff must prove facts sufficient to create an inference of discrimination.

Relying upon O'Connor v. Consolidated Coin Caterers Corporation, 517
U.S. 308 (1996); Narin v. Lower Merion School District, 206 F.3d 323 (3d Cir. 2000);
and Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326 (3d Cir 1995), CF previously
demonstrated that Plaintiff could not demonstrate a *prima facie* case of age
discrimination because he was not replaced by someone substantially younger than he.
Consolidated Freightways Corporation's Memorandum of Law In Support Of Its Motion
For Summary Judgment ("Supporting Memorandum") at 2-4.

In his opposition brief, Plaintiff disputes CF's demonstration by relying on
Judge Vanaskie's decision in Grabosky v. Tammac Corporation, 127 F.Supp.2d 610
(M.D. Pa. 2000).  Plaintiff's Brief In Opposition To Defendant's Motion For Summary
Judgment ("Opposing Memorandum") at 3.  Plaintiff correctly recounts that the court in
Grabosky made clear that a *prima facie* case of discrimination was not to be assessed in
some ritualistic or mechanistic fashion.  Consequently, a *prima facie* case was not
confined to a circumstance showing replacement by one outside of the protected category
at issue.

But Plaintiff's opposition to CF's *prima facie* argument stops short.  He
never explains how or in what manner he demonstrates any form of a *prima facie* case,
whether by a substantially younger replacement or any other evidentiary formulation.  In
effect, Plaintiff argues, *sub silentio*, that Grabosky actually stands for the proposition that

there no longer exists a *prima facie* burden of any kind as part of the analytical assessment of a discrimination case.

While CF agrees with the actual holding of <u>Grabosky</u>, it categorically disagrees with Plaintiff's ultimate *prima facie* opposing response. It is not surprising that Plaintiff never demonstrates how or in what manner <u>Grabosky</u> applies here, because, as used by Plaintiff, it is nothing more than a theoretical construct untethered to the circumstances involved herein. CF selected a replacement form of a *prima facie* case because it was the only one that appeared relevant to Plaintiff's Complaint allegations and the circumstances developed during discovery.

But neither <u>Grabosky</u> nor <u>Pivirotto v. Innovative Systems, Inc.</u>, 191 F.3d 344 (3d Cir. 1999), upon which <u>Grabosky</u> relies, in any way suggests that a plaintiff no longer has the evidentiary burden demonstrating an inference of unlawful discrimination before an employer must defend itself. To the contrary, the <u>Pivirotto</u> court noted, consistent with the Supreme Court's decision in <u>O'Connor v. Consolidated Coin Caterers Corp.</u>, <u>supra</u>, a plaintiff still must offer evidence "adequate to create an inference" of discrimination. <u>Pivirotto</u>, 191 F.3d at 355.

The Supreme Court recently examined the role of a *prima facie* case in discrimination litigation in <u>Swierkiewicz v. Sorema N.A.</u>, 122 S.Ct. 992 (2002). There, the Court held that, while a plaintiff need not plead a *prima facie* case, the establishment of a *prima facie* case still remains an essential evidentiary issue:

> The *prima facie* case under <u>McDonnell-Douglas</u>, however, is an evidentiary standard, not a pleading requirement. In <u>McDonnell-Douglas</u>, this Court made clear that "[t]he critical issue before us concern[ed] the order and allocation of proof in a private, non-class action challenging employment

discrimination." In subsequent cases, this Court has reiterated that the prima facie case relates to the **employee's burden of presenting evidence that raises an inference of discrimination.**

Id. (emphasis added) (internal citations omitted).

Given that Plaintiff does not offer any direct evidence of age discrimination or some statistical pattern suggesting age discrimination, he only can offer one possible event from which this Court can find a necessary inference of age discrimination – his alleged replacement by Patrick Corson. Opposition. Memo at 2-3. Thus, if Plaintiff cannot offer evidence that he was replaced by someone substantially younger than he in this case, he cannot establish a *prima facie* case.

### 2.    James Kot replaced Plaintiff.

In its Supporting Memorandum at 3, CF demonstrated that Mr. Kot, age 50, replaced Plaintiff. In his Opposing Memorandum at 2-3, Plaintiff asserts that Mr. Corson, age 31, replaced Plaintiff. Plaintiff's argument is based on the following:

> In support of this assertion, [Plaintiff's] affidavit establishes a basis for this conclusion since [Plaintiff] saw Mr. Corson working at the desk he previously occupied, working on the paperwork [Plaintiff] previously completed, received phone calls from Mr. Corson seeking assistance in completing [Plaintiff's] former duties, and was told by a superior that Mr. Corson replaced him.

However, these limited observations are insufficient to overcome CF's evidence that Mr. Kot replaced Plaintiff.

That Plaintiff saw Mr. Corson working at the desk Plaintiff used to use, is an argument without point.. Because Plaintiff fails to associate a particular desk with a particular position, such a generalized assertion is meaningless. Moreover, Mr. Corson

specifically addressed Plaintiff's observation that he worked at Plaintiff's prior work station as follows:

> Q:      Did you take over [Plaintiff's] desk when he left?
>
> A:      Prior to [Plaintiff] leaving, and I don't recall all the details, he was ill a short term, had a cold or something, and was on vacation. So I was using his desk in that time. At that point in time, when he — when I found out he was leaving, we were in the process of moving the department upstairs. I ended up with a totally different office. There were more offices upstairs. I had one beside Jim [Kot's].

Corson Dep. at 16, attached as **Exhibit A**.

As to the issue of paperwork, Mr. Corson addressed this issue as well:

> Q:      When [Plaintiff] was sent to Norristown, did your job change, your job title?
>
> A:      The title — yes, the title, the job title changed.
>
> Q:      What was the difference in what you did as dispatch operations manager as opposed to your previous job?
>
> A:      I primarily did most of the same things. I may not have always been there. Where I had typically been there at night, sometimes I was there during the day, depending on when it was needed. I set my own schedule, more or less. I did take over signing some of the paperwork and working with the secretary on some of the administrative work, but other than that I made mostly the same decisions that I'd made prior to.
>
> Q:      Did you take over any of [Plaintiff's] duties when you got the DOM job?
>
> A:      With the exception of the signing of the paperwork and being there probably more, I made

> more local decision because I was there more, but
> my job didn't change drastically.
>
> Q:    Who did you report to after [Plaintiff] left?
>
> A:    Jim Kot.

Corson Dep. at 14-15, attached as **Exhibit A.** Mr. Ferguson's deposition echoed this

point:

> [Mr. Corson] did the same thing.  He was
> responsible for those things.  He was – in fact, he
> was given those responsibilities by [Plaintiff]
> himself.  In [Plaintiff's] absence, he was responsible
> for training.  In [Plaintiff's] absence, he was
> responsible for the direct supervision of those front
> line supervisors.  So nothing really changed other
> than the title.

Ferguson Dep. at 47, attached as **Exhibit F.** Clearly, Mr. Corson's job as Mr. Kot's

assistant was substantially the same job he performed while Plaintiff's assistant.  While

there appears to be some minor changes in handling ministerial duties associated with

paperwork, those changes do not support the notion there is a material issue of fact that

Mr. Corson, in fact, replaced Plaintiff.

As to the third issue that Mr. Corson contacted Plaintiff to seek assistance

on completing duties begun by Plaintiff, Plaintiff's generalized showing again does not

logically demonstrate that Mr. Corson replaced Plaintiff.  In short, it does not follow that

a person calling to determine how to complete something started by another demonstrates

that the person calling is a replacement.  Following that logic to an extreme, if a clerical

employee called to find out where paperwork was or whether a communication was

made, such conduct would render the clerical employee the replacement of the superior

under Plaintiff's argument.

Significantly, Mr. Corson does not recall ever calling Plaintiff for advice after CF removed Plaintiff. Corson Dep. at 18-19, attached as **Exhibit A.** However, assuming, *arguendo*, that Mr. Corson made one or more phone calls to Plaintiff, Plaintiff fails to refute the overwhelming evidence that Mr. Kot replaced Plaintiff. The undeniable facts demonstrate that Mr. Corson's job did not substantially change, and it would not be unusual for Mr. Corson, as Plaintiff's former subordinate, to ask Plaintiff for assistance on work issues. Assuming he sought assistance after Plaintiff's removal, Plaintiff has not demonstrated that any particular phone call was something more than an assistant asking his former supervisor about an issue he still dealt with as an assistant to a new supervisor. Significantly, Plaintiff does not allege that this phone call addressed any uniquely different communication he had with Mr. Corson in the past.

Plaintiff's final argument that he "was told by a superior that Mr. Corson had replaced him," is not supported by the evidence. Opposing Memorandum at 3. In his affidavit, Plaintiff alleged that "George Scheck, one of my superiors, indicating about Pat Corson [sic] that the young man that replaced you is going crazy." Plaintiff's Affidavit at ¶ 5 (attached hereto as **Exhibit B**). However, the document itself makes no mention of Mr. Corson, and only refers to a "young man." See **Exhibit B.** There is no evidence presented to define to whom the "young man" reference is made. Given the state of the record, the "young man" reference equally could be to Mr. Kot.

Additionally, Plaintiff's identification of George Scheck as "one of my superiors" is not supported by the evidence. As Plaintiff admitted, he reported directly to Mr. Rice. In his deposition, Plaintiff identifies Mr. Scheck as the "maintenance

supervisor at the Carlisle Shop." Plaintiff's Dep. at 159, attached as **Exhibit C.** There is no evidence presented that Plaintiff and Mr. Scheck were anything other than peers.

The simple reality is that all of the deponents in this case, with the obvious exception of Plaintiff, agree that Mr. Kot replaced Plaintiff. CF's Statement of Undisputed Material Facts ("Facts"), at ¶¶ 21-21, 35, 59. While Mr. Corson supervised the same people as Mr. Kot while serving as Mr. Kot's assistant, Mr. Kot also supervised Mr. Corson. Facts, at ¶ 35. Thus, while Mr. Corson did supervise employees that Plaintiff once supervised, he did so under the direction of Mr. Kot, just as he had done while working under Plaintiff. Corson Dep. at 15, attached as **Exhibt A.** The evidence overwhelmingly demonstrates that Mr. Kot, age 50, replaced Plaintiff, age 56.

Consequently, Plaintiff was not replaced by someone substantially younger, as required by Supreme Court and Third Circuit precedent. See O'Connor, 517 U.S. at 312-13; Narin, 206 F.3d at 333, n.9. Without meeting this evidentiary burden, Plaintiff has no basis upon which to satisfy his *prima facie* burden of creating an inference of discrimination. See Swierkiewicz, 122 S. Ct. at 996; Pivirotto, 191 F.3d at 352; Grabosky, 127 F.Supp.2d at 619. Consequently, CF is entitled to summary judgment on this basis alone.

### B. Plaintiff Cannot Establish Pretext.

Previously, CF not only articulated legitimate, non-discriminatory reasons for Plaintiff's removal, but also it clearly demonstrated that those same reasons were not pretextual. Supporting Memorandum at 5-8. Thus, Plaintiff admitted that the problems CF identified in the Carlisle line-haul department existed under Plaintiff's supervision. Facts, at ¶¶ 43-45. Plaintiff admitted that, under his direction, attrition and penalty pay

were problems. Facts, at ¶¶ 43-45. Plaintiff admitted that, from 1998 until his reassignment in 1999, the Carlisle line haul department experienced the heaviest turnover of positions during his tenure. Facts, at ¶ 43. Furthermore, Plaintiff admits that, from 1997 until his reassignment in 1999, he did not meet CF's target for penalty pay percentage. Facts, at ¶¶ 44-45.

These deficiencies were all the more glaring given that the Carlisle terminal was the most important terminal in the Northeast and Mid-Atlantic regions. Facts, at ¶ 15. All of these factors – the importance of the Carlisle terminal, Plaintiff's attrition problems, penalty pay failings, and lack of leadership skills – led to Pete Ferguson's decision to remove Plaintiff from his position. Facts, at ¶ 13.

In opposition to CF's reliance on Plaintiff's admissions, Plaintiff bases a pretext argument on seven events: (1) CF's favorable performance rating of Plaintiff in April 1999; (2) his 3% salary increase in April 1999; (3) a June 1999 E-mail, in which Mr. Ferguson noted that penalty pay performance was improving; (4) Mr. Rice's alleged statement that "he hated to lose [Plaintiff] because he was a good worker but he was just following orders"; (5) Mr. Rice's testimony that he thought he was transferring Plaintiff to Philadelphia to run the terminal; (6) Mr. Ferguson's testimony that he considered making Plaintiff the terminal manager in Baltimore; and (7) Plaintiff's assignment to York as one of the Freight Operations Managers, which he alleges is a top management position. Opposing Memorandum at 5-6.

With respect to Plaintiff's claimed favorable performance rating and increase, Mr. Rice specifically addressed these issues:

> Q:    Did he receive any merit increases while you were there?

A:     Yes, he did.

Q:     If you were dissatisfied with his performance, why did he receive a merit increase?

A:     When I came in, I gave him an increase in good faith that we were going to turn this around. I think that was in March.

\*           \*           \*

Q:     In your evaluation of [Plaintiff], do you recall what, if anything, you criticized him for?

A:     All of the things we mentioned earlier, the inability to communicate, not being able to reach our numbers.

Q:     For penalty pay?

A:     Yes.

\*           \*           \*

Q:     Did you mention attrition in your evaluation of him?

A:     Yes.

Rice Dep. at 36-38, attached as **Exhibit D.**

Thus, the reality of this communication is that Plaintiff received an oral evaluation during which Mr. Rice pointed out the very deficiencies which resulted in Plaintiff's later reassignment. To the degree the evaluation was favorable, Plaintiff does not explain how and or in what manner is was "favorable." Characteristically, we are left with supposition as to how Mr. Rice supposedly viewed Plaintiff in a favorable light. Certainly, such a generality does not suggest that Mr. Rice uttered specific complimentary comments about Plaintiff's performance in those areas in which CF found specific deficiencies.

Consequently, even if there were something about Plaintiff's attendance, cooperation, etc. that met Mr. Rice's expectations, it is clear that Plaintiff did not meet CF's expectations in those area that prompted Mr. Ferguson to direct Plaintiff's removal and reassignment. The fact that Mr. Rice felt that he would use a pay adjustment as a means to encourage Plaintiff to succeed in all areas, does not denigrate the fact of his failure and CF's holding him accountable for those failures.

Plaintiff's reliance on an E-mail from Mr. Ferguson also is misplaced. A close examination of the document demonstrates that, while Mr. Ferguson noted an improvement in the penalty pay issue, he reiterated his persistent concerns over the problems with attrition. <u>See</u> **Exhibit E.** Specifically, the E-mail recounts that, "[i]n the penalty pay arena we are beginning to show some improvement in spite of the turnover problems." Furthermore, the email identifies that the penalty pay rate was 17.0, which still is significantly higher than Plaintiff's target of 12.3. <u>See</u> **Exhibit E**; Facts, at ¶ 45. Therefore, on its face, this document does not offer any evidence of pretext; rather, it confirms there remained significant problems in the line haul department of which Plaintiff was aware. Moreover, the timing of the E-mail says nothing of Plaintiff's deficiencies at the time of his removal in August.

Plaintiff also asserts that Mr. Rice stated "he hated to lose him because he was a good worker . . ." Opposing Memorandum at 5. Mr. Rice denies this statement. Rice Dep. at 33-34, attached as **Exhibit D.** But even assuming the statement was made, it does not demonstrate any inconsistency in CF's position. How or in what manner Mr. Rice viewed Plaintiff as "a good worker" in no way demonstrates an inconsistency in the specific criticisms CF held against Plaintiff. While CF clearly valued Plaintiff's general

abilities – he remains employed with CF today – he simply could not overcome the specific difficulties he experienced running the Carlisle line-haul department. The statement does not change the reality of Plaintiff's admitted performance deficiencies, which ultimately led to his removal.

Finally, Plaintiff points to the positions he was either offered or considered for as evidence of pretext. Plaintiff's point ignores the most important fact that the terminals for which he was considered were not comparable to the Carlisle terminal. The Carlisle terminal is the biggest terminal in the CF system when measured by shipping volume. Facts, at ¶ 17. The Carlisle terminal has 240 doors, or loading slots. Ferguson Dep. at 76, attached as **Exhibit F**. By comparison, the York terminal has 110 and the Philadelphia terminal has 83. Ferguson Dep. at 76, attached as **Exhibit F**.

In comparison, the first terminal to which Plaintiff first was assigned was in the process of being closed. Ferguson Dep. at 22, attached as **Exhibit F**. The position for which he was considered in Baltimore had significantly less impact on CF's overall operations than the running the Carlisle line haul department. Facts, at ¶¶ 15-17. Plaintiff's final assignment, one of the four, freight-operations managers in the York terminal, also carried with it significantly less responsibility and impact on CF's operations. By contrast, Carlisle line haul's importance overshadowed all other locations on the East coast.

Thus, CF's actions were wholly consistent with Plaintiff's admitted performance problems – he only was considered for positions, and ultimately assigned to a position, with significantly less responsibility but which utilized the "skill sets" Plaintiff

possessed that CF still felt could be "contributory to this company." Ferguson Dep. at 23, attached as **Exhibit F.**

In light of the foregoing, and taken as a whole, Plaintiff's alleged evidence of pretext fails to provide a sufficient basis upon which a reasonable fact finder could disbelieve CF's legitimate business reasons.

### III.      CONCLUSION

For the reasons set forth above, it is clear that Plaintiff's opposition is based upon metaphysical doubt. See Matsushita Electric Industrial Co., Ltd., et al v. Zenith Radio Corp., et al, 475 U.S. 574 (1986). The Supreme Court, in Matsushita, held that, "to survive [defendant's] motion for summary judgment, [Plaintiff] must establish that there is a genuine issue of material fact . . ." Matsushita, 475 U.S. at 585-586. The Supreme Court stressed that "the issue of fact must be genuine," holding that:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Id., at 586-587 (internal citations omitted) (emphasis in original). Here, Plaintiff relies

on the general in the face of specifics.  For the reasons given and those set forth in its

Supporting Memorandum, CF respectfully requests that its motion be granted.

Respectfully Submitted,

VINCENT CANDIELLO
G. SCOTT PATERNO
One Commerce Square
417 Walnut Street
Harrisburg, PA  17101-1904
717.237.4000

Of Counsel:

**MORGAN, LEWIS & BOCKIUS LLP**

Dated:  April 1, 2002

1-HA/99141.2

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD C. WOJEWODZKI,                    :
                    PLAINTIFF             :
                                          :
            VS                            :    NO. 1:CV01-285
                                          :
CONSOLIDATED FREIGHTWAYS, INC.,           :
                    DEFENDANT             :


DEPOSITION OF:  PATRICK W. CORSON

TAKEN BY:       PLAINTIFF

BEFORE:         SHERRY BRYANT, RMR, CRR
                NOTARY PUBLIC
DATE:           JANUARY 8, 2002, 1:40 P.M.
PLACE:          MORGAN, LEWIS & BOCKIUS
                417 WALNUT STREET
                HARRISBURG, PENNSYLVANIA


APPEARANCES:

        MARKOWITZ & KREVSKY, P.C.
        BY: LAWRENCE S. MARKOWITZ, ESQUIRE
              FOR - PLAINTIFF
        MORGAN, LEWIS & BOCKIUS
        BY: VINCENT CANDIELLO, ESQUIRE

              FOR - DEFENDANT
        GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

"Exhibit A"

14

1   A   Yes. But, as I say, that not necessarily in a
2 harsh way, just that I would agree that two things. I was
3 concerned that Dick's fuse was too short with some of our
4 supervisors, particularly the newer ones with less
5 experience, out of frustration, which I understood, but --
6 and the other would be, although not to the extent of Steve,
7 that yes, there were some changes that needed to occur to
8 make us more successful and that we didn't seem to be moving
9 in that direction and as quickly as we should.
10   Q   Did you ever hear Jeff criticize Dick's
11 performance?
12   A   I don't know that criticize is the word, but
13 there was concern on his part as well that we weren't moving
14 as quickly as we needed to in the direction that people felt
15 the department needed to go.
16   Q   Did you ever hear Pete Ferguson comment on
17 Dick's job performance?
18   A   No.
19   Q   When did you learn that Dick was being
20 transferred to Norristown?
21   A   I didn't know until he got there.
22   Q   When Dick was sent to Norristown, did your job
23 change, your job title?
24   A   The title -- yes, the title, job title
25 changed.

15

1   Q   What was the change in the job title?
2   A   It changed to dispatch operations manager.
3   Q   What was the difference in what you did as
4 dispatch operations manager as opposed to your previous job?
5   A   I primarily did most of the same things. I
6 may not have always been there. Where I had typically always
7 been there at night, sometimes I was there during the day,
8 depending on when it was needed. I set my own schedule, more
9 or less. I did take over signing some of the paperwork and
10 working with the secretary on some of the administrative
11 work, but other than that I made mostly the same decisions
12 that I'd made prior to.
13   Q   Did you take over any of Dick's duties when
14 you got the DOM job?
15   MR. CANDIELLO: Objection to the form.
16 BY MR. MARKOWITZ:
17   Q   You may answer.
18   MR. CANDIELLO: You may answer.
19   A   With the exception of the signing of the
20 paperwork and being there probably more, I made more local
21 decisions because I was there more, but my job didn't change
22 drastically.
23 BY MR. MARKOWITZ:
24   Q   Who did you report to after Dick left?
25   A   Jim Kot.

16

1   Q   Did you take over Dick's desk when he
2 transferred?
3   A   Prior to Dick leaving, and I don't recall all
4 the details, he was ill a short term, had a cold or
5 something, and was on vacation. So I was using his desk in
6 that time. At that point in time, when he -- when I found
7 out he was leaving, we were in the process of moving the
8 department upstairs. I ended up with a totally different
9 office. There were more offices upstairs. I had one beside
10 Jim's. Up until then I had had no office.
11   Q   Were you interviewed for the DOM job?
12   A   Yes.
13   Q   Who interviewed you for that job?
14   A   Mark Bunte.
15   Q   Anyone else?
16   A   I don't think so. I spoke with Jeff regarding
17 interest in the job, but I don't recall that he and I ever
18 had a formal interview. I believe that that was left to
19 Mark.
20   Q   And what's Mark's job?
21   A   At that time, Mark was director of line haul
22 operations in Menlo Park.
23   Q   What was discussed during the job interview?
24   A   I don't recall anything particular. I really
25 don't remember.

17

1   Q   Okay.
2   A   It was very informal at a coffee shop down the
3 street from the terminal. And I guess if there's anything I
4 do remember, it was that we needed to be more aggressive than
5 we had been in the past in getting the department in the
6 direction that everybody felt that it should go.
7   Q   Did he indicate to you how your
8 responsibilities would be changing if you got this new job?
9   A   That the structure of the office was going to
10 change. I would be reporting to Jim, but being that I had
11 been there in the department longer than Jim, I would
12 basically be a resource to him from the line haul aspect and
13 he would be the leader of the department. I would supply
14 more expertise to the local operation and he would basically
15 be the leader of the department.
16   Q   Did you and Jim work overlapping hours for the
17 most part or did you work like you did with Dick where your
18 hours really didn't overlap all that much?
19   A   This is going to sound odd, but I never
20 worked -- I would maybe be there for 12 hours and be gone
21 four and be back. It was different than when Dick was there,
22 but I really didn't have -- I was there more during the
23 daytime, but I really didn't have a set schedule.
24   Q   Did you have a set schedule when Dick was
25 there?

18

1  A    Yes, but, as I said, sometimes in the morning
2  when he got there when I would normally be leaving, sometimes
3  it would be 7 in the morning, but I would still be there till
4  noon doing different functions, trying to help him or
5  whoever. So it was more set, but on paper I guess.
6  Q    When you received the promotion to DOM, did
7  you also -- was that a promotion or a lateral move?
8  A    I would say it was a promotion.
9  Q    And did you receive a salary increase with it?
10  A    Yes.
11  Q    Did you ever discuss with Dick what happened
12  about why he was transferred to Norristown?
13  A    No.
14  Q    Have you spoken with him since he was
15  transferred to Norristown?
16  A    Yes.
17  Q    On how many occasions?
18  A    Three or four. Nothing pertaining to other
19  than hi, how are you.
20  Q    Would this be because you ran into him
21  someplace or --
22  A    I spoke with him on the phone when he was in
23  Philadelphia as he was doing some dispatch functions in his
24  time down there. And then, of course, once he went to York I
25  would speak with him on the phone as he was dispatching down

20

1  STATE OF PENNSYLVANIA    :
                            : ss
2  COUNTY OF DAUPHIN        :
3        I, Sherry Bryant, a Reporter Notary-Public,
4  authorized to administer oaths within and for the
5  Commonwealth of Pennsylvania and take depositions in the
6  trial of causes, do hereby certify that the foregoing is the
7  testimony of PATRICK W. CORSON.
8        I further certify that before the taking of
9  said deposition, the witness was duly sworn; that the
10  questions and answers were taken down stenographically by the
11  said reporter Sherry Bryant, a Reporter Notary-Public,
12  approved and agreed to, and afterwards reduced to typewriting
13  under the direction of the said Reporter.
14        I further certify that the proceedings and
15  evidence contained fully and accurately in the notes by me on
16  the within deposition, and that this copy is a correct
17  transcript of the same.
18        In testimony whereof, I have hereunto
19  subscribed my hand this 12th day of January 2002.
20
21
22            Sherry Bryant, RMR, CRR
23  My commission expires:
        December 13, 2005
24
25

19

1  there.
2  Q    Did you ever find it necessary to call him to
3  request help with how to do something, like a project or
4  anything like that?
5  A    I don't recall, but not that I'm aware of.
6  Q    Do you know if Jim ever had to do that?
7  MR. CANDIELLO: Jim Kot?
8  MR. MARKOWITZ: Yes.
9  A    I know there have been even recently, he's
10  needed to be contacted on labor issues, how things were or
11  what policy we had in a certain area back when he was there,
12  how things were handled. I don't know any specifics, but I
13  know that at times there are e-mails sent out from the labor
14  department on, you know, what's our past procedures on that
15  and he's included in them.
16  BY MR. MARKOWITZ:
17  Q    For like union grievance type things?
18  A    Yes.
19  MR. MARKOWITZ: I think that's all the
20  questions I have.
21  MR. CANDIELLO: I have no questions.
22  MR. MARKOWITZ: Thank you.
23  (The deposition was concluded at 2:13 p.m.)
24
25

3.     Mr. Corson was in his late 20s or early 30s at the time that I was relieved of my duties.

4.     Mr. Kot did take over the Northeast Regional Center for me; however, that task was only 25 percent of my job.  Pat Corson performed the remaining 75 percent of my duties.

5.     After I left Carlisle, I received an e-mail from one of my superiors, George Scheck, indicating about Pat Corson that the young man that replaced you is going crazy.  A copy of the e-mail is attached hereto.

6.     I have reviewed Exhibit 2 attached to Defendant's Motion for Summary Judgment.  I am familiar with this form during my many years of service with the company.  It is my belief that the exhibit has been altered because of the differences in how the form was filled out (writing on part of the form versus typing on part of the form), and the three different dates contained with the exhibit.  This would not be Defendant's usual and customary practice.

_____
Richard C. Wojewodzki

Sworn to and affirmed before

me this 25th of May ,

2001.

_____
Notary Public

NOTARIAL SEAL
JUDY A. SNYDER, Notary Public
York, York County, PA
My Commission Expires April 1, 2002

"Exhibit B"

```
TO:    DICK SKT                              CMF-MA-CL-DCS   2-Sep-99 03:42:35
       CFMF / CPD
       1 CAROLINA WAY
       CARLISLE                 PA 17403

FROM: GEORGE SCHAACK                         CMF-MA-CL-GES   1-Sep-99 13:44:07
      CFC / CPS

SUBJECT: GOING CRAZY                         CMF-MA-CL-DCS/MA#9721511

-----------------------------------------------------------------

To:    DICK SKT
From:  GEORGE SCHAACK                              CMF-MA-CL-DCS
Date:  Wednesday 1-Sep-99 at 1:51pm (4:51pm Local time)   CMF-MA-CL-GES
Subject: GOING CRAZY

HI BUDDY.. I'AM SORRY WE DIDN'T HAVE A CHANCE TO TALK.. JUST A POINT
OF INFO, THE YOUNG MAN THAT IS TRYING TO FILL YOUR SHOES IS ON THE
VERGE OF GOING OFF THE END OF THE CLIFF..  THEY THOUGHT IT WAS SO
EASY!!!

HEY KEEP IN TOUCH !!

YOUR FRIEND IN THE SHOP!!

********** Routed on: Thu  2-Sep-99 at:  3:42pm
    From: CMF-MA-CL-DCS DICK SKT
      To: CMF-MA-NO-NO3 NOP3 PRTNIER                    CTCS Printer

-----------------------------------------------------------------


* * End of Message * * Printed on    2-Sep-99 at 03:42:39 MA# 9721511
```

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD C. WOJEWODZKI,                    :
                    PLAINTIFF             :
                                          :
          VS                              :     NO.  1:CV01-285
                                          :
CONSOLIDATED FREIGHTWAYS, INC.,           :
                    DEFENDANT             :


VOLUME 1


          VIDEO
          DEPOSITION OF:  RICHARD C. WOJEWODZKI
          TAKEN BY:       DEFENDANT
          BEFORE:         SHERRY BRYANT, RMR, CRR
                          NOTARY PUBLIC

                          TORR PIZZILLO, LEGAL
                          VIDEO SPECIALIST
          DATE:           OCTOBER 31, 2001, 10:06 A.M.
          PLACE:          MORGAN, LEWIS & BOCKIUS
                          417 WALNUT STREET
                          HARRISBURG, PENNSYLVANIA


APPEARANCES:
      MARKOWITZ & KREVSKY, P.C.
      BY: LAWRENCE S. MARKOWITZ, ESQUIRE

          FOR - PLAINTIFF

      MORGAN, LEWIS & BOCKIUS
      BY: VINCENT CANDIELLO, ESQUIRE
          FOR - DEFENDANT


      GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

"Exhibit C"

**158**

1 contend directly evidences discrimination. Tell us what they
2 are. The first entry is statements in the company newspapers
3 regarding age. I take it you have disclosed to us those
4 company newspapers that you're relying on?
5   A     Yes, sir.
6   Q     Can you identify for us which newspapers and
7 which statements, so we don't have to read them cover to
8 cover, in all the ones you have disclosed, can you tell us
9 which of those newspaper articles directly evidence ageist
10 statements?
11   A     I can't give you specific volume copies of a
12 newspaper, but as you can -- if you take a look at the
13 biweekly publication of the company, you will see the
14 different promotions that were in there, the younger profile
15 that the company's trying to pose to other people.
16   Q     You're telling me, sitting there today, you
17 cannot find any of these statements that you claim to exist
18 in these newsletters regarding age, even if we went off the
19 record?
20   A     I can't give you -- I can't give you the
21 volume number that this appears in, no, I can't.
22   Q     Even if we went off the record at this point
23 in time and gave you 15 minutes, you don't think you could
24 find one?
25   A     There's a possibility we found a couple or a

**159**

1 few. I'm just saying that the image which is put forth by
2 the company of younger employee.
3       MR. CANDIELLO: We will put this in writing,
4 Mr. Markowitz, but we believe that is an insufficient
5 response to just simply say statements that are unidentified
6 in the company newspapers and then say find them yourself.
7 And I will reserve further questioning once those have been
8 identified, since I am not at all certain that we can get
9 them all in today. I think these are things that should have
10 been identified in the answers, which then we would have been
11 able to pull them together and be able to efficiently go
12 through them for purposes of the deposition.
13 BY MR. CANDIELLO:
14   Q     You also have George Schack's comment
15 evidenced in e-mail. What is that?
16   A     It was an e-mail sent to me by George Schack
17 that stated that the young man who has taken over your
18 position is having a difficult time about it. He thought it
19 was going to be so easy.
20   Q     Who is George Schack?
21   A     George Schack was the maintenance supervisor
22 at the Carlisle shop.
23   Q     Who do you believe had decision making
24 authority in removing you from Carlisle?
25   A     I would say there were four people involved.

**160**

1 It was Wayne Kennard, Pat Brady, eastern area VP, Mark Bunte,
2 Steve Deichman, possibly Jeff Rice, five.
3   Q     Not Mr. Ferguson?
4   A     Mr. Ferguson, I'm sorry.
5   Q     So let's go over. Why would Steve Deichman
6 have anything to say about your removal?
7   A     He had a direct line of communication to Mark
8 Bunte and he's the one that sent out e-mail stating that
9 something about older employees, which you should have a copy
10 of.
11   Q     I have your e-mails. Please let me know which
12 one you're referring to.
13       MR. CANDIELLO: Let's go off record.
14       THE VIDEO OPERATOR: We are now going off
15 camera. The time is 3:20.
16       (Discussion held off the record.)
17       THE VIDEO OPERATOR: We are now back on
18 camera. The time is 3:44.
19 BY MR. CANDIELLO:
20   Q     Mr. Wojewodzki, I appreciate very much your
21 taking the time to go through that stack of records. What
22 have you identified that went through that?
23   A     These are the e-mails on promotions, okay, and
24 it shows you the years that they started with the company.
25 Not every one is labeled, you know, with the years that they

**161**

1 started, but you'll see that it's 1982, 1984, or there should
2 be one in here, it was just about a year ago, just started
3 with company, has been promoted to terminal manager.
4       You know, it's -- you know, that's what I'm
5 trying to show is that it's younger people that are getting
6 promoted to positions.
7   Q     It's your -- okay, just so that I
8 understand --
9   A     It's my opinion.
10   Q     Just so that I can understand what you're
11 saying, you're saying that when you go through the listing,
12 and I'm just going to say these are e-mails apparently that
13 are provided system-wide at the time of a promotion?
14   A     Yes, sir, that is correct.
15   Q     So these would be sent to you as well as other
16 employees of CF at the time it would be distributed?
17   A     Yes, sir.
18   Q     And we take an example on the top of a Marty
19 Larson who is appointed to senior vice-president of sales
20 and marketing and in the document itself he says, it says, "Marty
21 been a CF team member since 1982." So when you read that,
22 what conclusions are you drawing then, that this person is
23 young?
24   A     He's younger than I am. I started with the
25 company in 1972.

**41**

RICE, JEFFREY
01/16/02

WOJEWODZKI VS
CONSOLIDATED FREIGHTWAYS

1                      IN THE UNITED STATED DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
   RICHARD C. WOJEWODZKI,                :
3                      PLAINTIFF         :
                                         :
4              VS                        :   NO. 1:CVO1-285
                                         :
5 CONSOLIDATED FREIGHTWAYS, INC.,        :
                      DEFENDANT          :
6
7
8
9
10
                   DEPOSITION OF:   JEFFREY L. RICE
11
                   TAKEN BY:        PLAINTIFF
12
                   BEFORE:          DONNA J. FOX, REPORTER
13                                  NOTARY PUBLIC
14     DATE:                        JANUARY 16, 2002, 1:00 P.M.
15     PLACE:                       MORGAN, LEWIS & BOCKIUS
                                    417 WALNUT STREET
16                                  HARRISBURG, PENNSYLVANIA
17
18
19
20 APPEARANCES:
21     MARKOWITZ & KREVSKY, P.C.
          BY:  LAWRENCE S. MARKOWITZ, ESQUIRE
22
                   FOR - PLAINTIFF
23
       MORGAN, LEWIS & BOCKIUS
24     BY:  VINCENT CANDIELLO, ESQUIRE
25                 FOR - DEFENDANT

"Exhibit 1"

**RICE, JEFFREY**
**01/16/02**

**WOJEWODZKI VS**
**CONSOLIDATED FREIGHTWAYS**

---

30

1 duties?
2    A    Just the basic fundamentals of the operation:
3 Make sure everything was running right and reporting to Jim
4 any problems he might have had. Basically a lot of times,
5 he would just fill in for different supervisors, also.
6    Q    That was his job when he worked under
7 Mr. Wojewodzki, also?
8    A    Exactly.
9    Q    You mentioned that you talked to various
10 employees about Mr. Wojewodzki and their thoughts and
11 feelings about him. What did that reveal to you?
12    A    That's where I got the information that his
13 communication skills lacked. I had supervisors come to me
14 in private to my office and let me know their concerns about
15 the line haul operation.
16    Q    Such as who?
17    A    Some of the supervisors are no longer there.
18 Chris Farland, Steve Sheaffer. I'm trying to think of some
19 of the names. Ronnie Polovac. Just about -- maybe about
20 four different people came to my office and just expressed
21 their concern.
22    Q    Did you ever observe Mr. Wojewodzki
23 communicate inappropriately towards one of his employees?
24    A    Yes.
25    Q    Can you give me an example of what you

---

31

1 observed?
2    A    What I observed was him being short,
3 quick-tempered. And what it revealed to me was I don't have
4 the time to talk to you. So it kind of turned the guys
5 off. When they needed to go to him, they just didn't go to
6 him.
7    Q    Who did they go to instead?
8    A    Pat.
9         MR. CANDIELLO: Pat Corson?
10    A    Yes.
11 BY MR. MARKOWITZ:
12    Q    Who was charged with the responsibility of
13 telling Mr. Wojewodzki that he was being transferred?
14    A    I was.
15    Q    Do you remember what day you did that?
16    A    I'm thinking. And to the best of my memory,
17 it was a Thursday.
18    Q    Tell me to the best of your recollection what
19 was said by you and by Mr. Wojewodzki in that conversation.
20    A    First, I asked Dick to come over to my office
21 because I discovered that he was in the line haul building,
22 which I didn't know -- he wasn't supposed to be at work that
23 day. And I was already in the process of trying to get a
24 hold of him. So I said could you stop over here.
25         When he stopped over there, I told him, I

---

32

1 said, look, Dick, I'm going to have to take you out of your
2 position and you're going to be reporting to I believe it
3 was Norristown on Monday. So he said, well, what's that all
4 about? I said, the fact that we couldn't get the job done,
5 we're taking you out of your position.
6    Q    What did he say?
7    A    He said, well, no one said anything to me.
8 And I did tell, I said Dick, we talked about this over and
9 over, you knew what the situation was, you and me; and it
10 came to the point where we had to take you out of the
11 position so we can get this thing turned around.
12    Q    When he said to Norristown, was he still
13 on Carlisle's payroll or how did that work?
14    A    No.
15    Q    He went to Norristown's payroll?
16    A    I can't answer that. The only thing I did is
17 did the 192, the division office transferring him out of
18 Carlisle.
19         Pete Ferguson would have had his payroll. I
20 don't know where his payroll would have shown on that. I
21 would think it would have to be the division office.
22    Q    Did you tell Mr. Wojewodzki in the meeting
23 where you were letting him know about transferring to
24 Norristown that you didn't know why he was being
25 transferred?

---

33

1    A    No.
2    Q    Did you know what his duties were supposed to
3 be in Norristown?
4    A    No.
5         Can I add something?
6    Q    Of course.
7    A    I didn't know what his duties were, but I knew
8 there was a terminal manager who was moved to Philadelphia.
9 So I would assume that he would be running the terminal.
10    Q    Did Mr. Wojewodzki ask you if
11 Mr. Ferguson was behind the decision to move him to
12 Norristown?
13    A    I believe he did. And I said, yes, but I said
14 I agreed with him.
15    Q    Did he box his items at that time?
16    A    Pardon me?
17    Q    Did Mr. Wojewodzki box his items at that time
18 when he --
19    A    That day?
20    Q    Yes.
21    A    No. As a matter of fact, he said he would be
22 back on the weekend.
23    Q    During this meeting did you tell
24 Mr. Wojewodzki that you hated to lose him because he was a
25 good worker but you had to do what you were told?

---

**RICE, JEFFREY**
**01/16/02**

**WOJEWODZKI  VS**
**CONSOLIDATED FREIGHTWAYS**

---

**34**

1  A      No.
2  Q      Did you say anything like that?
3  A      I said exactly what I just told you.
4  Q      Did you tell him that you hated to lose him?
5  A      No.
6  Q      Did you discuss with him in any ways what his
7  promotional opportunities might be in Norristown or
8  Philadelphia?
9  A      No.  I couldn't.  I couldn't speak on that
10  because I didn't know what his position was going to be.
11  And I do remember telling him that Pete was going to be
12  there on Tuesday and he could talk to Pete on Tuesday.
13  Q      Pete would be in Norristown?
14  A      Yes.
15  Q      Had anyone been cross-trained to do Dick's job
16  in line haul?
17  A      No.
18  Q      Would he come in on vacation days to do work?
19  A      I've known him to come in on his vacation and
20  do something, yes.
21  Q      Why do you think Mr. Wojewodzki was unable to
22  succeed as ATM in Carlisle?
23        MR. CANDIELLO:  Objection.  Calls for
24  speculation.  You may answer.
25  A      What was the question again?

---

**35**

1  BY MR. MARKOWITZ:
2  Q      Why do you think Mr. Wojewodzki was unable to
3  succeed as ATM in Carlisle?
4  A      I think there was a number of things.  For
5  one, he never followed through.  He had poor communication
6  skills.  And for some reason, Dick was very paranoid of his
7  position that there was somebody always going to take his
8  place.
9  Q      Was there ever any discussion in which you
10  participated where the topic came up of just terminating
11  Dick as opposed to transferring him?
12  A      Yes.
13  Q      Who was involved in that conversation?
14  A      Just myself and Pete Ferguson.
15  Q      When did that conversation occur?
16  A      I couldn't tell you.
17  Q      Before or after Ferguson told you to get him
18  transferred?
19  A      Before.
20  Q      Tell me about that conversation and what you
21  recall about it.
22  A      I don't think the word terminated was ever
23  stated.  The fact that if Dick can't get the job done, we're
24  going to have to take him out.  But the word terminated was
25  never used.

---

**36**

1  Q      By take him out, did you understand that to
2  mean terminated or just put him elsewhere in the system?
3  A      To me it just meant taking him out and not
4  putting him anywhere.
5  Q      What are the factors that can contribute to
6  penalty pay rates being high?
7  A      Basically not being prepared when the drivers
8  come to report to work, not having work ready for them, not
9  knowing when your teams and your drivers are due into the
10  facility, especially say like a sleeper team or a team
11  coming in that you're paying double for; and you know
12  they're coming because they were on the reports but yet
13  we're not prepared for them when they get there.  So that's
14  all wait time.
15  Q      How about bad weather, would that also
16  influence it?
17  A      Bad weather can be planned for.  If it's bad
18  weather and we know they're not coming, there would be no
19  penalty pay.  Penalty pay is only when they are on the
20  facility.
21  Q      Did you ever do an annual review of Dick?
22  A      I did once when I went into Carlisle.
23  Q      Do you recall how he fared on that review?
24  A      I would think average.
25  Q      Did he receive any merit increases while you

---

**37**

1  were there?
2  A      Yes, he did.
3  Q      If you were dissatisfied with his performance,
4  why did he receive a merit increase?
5  A      When I came in, I gave him an increase in good
6  faith that we were going turn this around.  I think that was
7  in March.
8  Q      Are increases given just once a year?
9  A      Annual increases, yes.
10  Q      So he didn't miss any increases as a
11  punishment for not turning it around?
12  A      No.
13  Q      In your evaluation of Dick, do you recall
14  what, if anything, you criticized him for?
15  A      All of the things we mentioned earlier, the
16  inability to communicate, not being able to reach our
17  numbers.
18  Q      For penalty pay?
19  A      Yes.
20  Q      That's a yes?
21  A      Pardon me?
22  Q      That's a yes?
23  A      I'm sorry.  Yes.
24  Q      Did you mention attrition in your evaluation
25  of him?

---

**38**

1   A    Yes.
2   Q    Did you ever see an e-mail from Pete Ferguson
3 to Dick on June 16th, 1999, congratulating him for good
4 improvement in the line haul penalty-pay situation?
5   A    I can't recall.
6   Q    From the time that you took over to the time
7 that Mr. Wojewodzki was transferred, what was the trend in
8 penalty pay? Was it upwards, downwards or staying the same?
9   A    Upward.
10   Q    How much upward?
11   A    I couldn't tell you.
12   Q    Did it ever go down at any time during that
13 period?
14   A    Yes.
15      MR. CANDIELLO: Which period?
16      MR. MARKOWITZ: The period from when he came
17 in to Carlisle to when Dick left.
18   A    Yes, because penalty pay came down weekly.
19 Actually, you could monitor it per day.
20 BY MR. MARKOWITZ:
21   Q    But if we looked at it on a monthly basis, was
22 he each month getting worse or were there some months where
23 there was actually improvement shown?
24   A    The answer to that question is sometimes it
25 was less but it was always over.

**39**

1   Q    As a supervisor did you have a choice whether
2 to give a pay raise or not to give a pay raise?
3   A    Yes.
4   Q    Did Steve Deichman ever make any observations
5 to you about Dick's work performance?
6   A    Yes.
7   Q    Tell me about that.
8   A    Basically he just said Dick cannot get the job
9 done, Dick is not the man to run regional control.
10   Q    Did he say why?
11   A    He just doesn't have the expertise or the
12 ability to do it.
13   Q    What was Mr. Deichman's job when he said that?
14   A    I think he was a field trainer.
15   Q    Did Mr. Deichman have any supervisory
16 authority over Mr. Wojewodzki?
17   A    I'm not sure if he had authority over him, but
18 he reported directly to Mark Bunte. So the things that he
19 did was approved by Mark.
20   Q    What opportunity did Mr. Deichman have to
21 observe Mr. Wojewodzki's performance?
22   A    Could you repeat the question, please.
23   Q    Sure. What opportunity did Mr. Deichman have
24 to observe Mr. Wojewodzki's performance?
25   A    He would rotate to different locations. So he

**40**

1 would be in Carlisle and could possibly be in there for
2 three weeks at a time.
3   Q    When he was there, what was his job?
4   A    To work on any problem areas.
5   Q    He was basically a troubleshooter?
6   A    Yes.
7   Q    Did anyone else aside from yourself have to
8 approve the pay raise that Mr. Wojewodzki got in March or
9 April of 1999?
10   A    Yes.
11   Q    Who else would have had to sign off on it?
12   A    That would have to be Pete Ferguson.
13   Q    Would Pat Brady also have to sign off on it?
14   A    Yes.
15   Q    Anyone else?
16   A    I'm not sure. There's like six lines, and I
17 only know whose line's behind me. When I was division
18 manager, then you had to have the area vice president
19 approve it. So I know it went to that level.
20   Q    In your conversation with Mr. Wojewodzki when
21 you were telling him that he was being transferred to
22 Norristown, were there any discussions of how this was going
23 to affect his pay, if at all?
24   A    There was questions asked, but I couldn't
25 answer them.

**41**

1   Q    Did you provide him with the name of someone
2 who could answer that question?
3   A    I told him that Pete would be in there on
4 Tuesday and Pete was going to talk to him on Tuesday.
5   Q    But that was something that came up in the
6 transfer meeting?
7   A    Yes.
8   Q    Since the time of his transfer, has
9 Mr. Wojewodzki ever come under your supervision again?
10   A    No.
11   Q    After the transfer was made, who did Jim Kot
12 end up supervising?
13   A    He supervised everyone in the line haul
14 operation.
15   Q    Who did Pat Corson supervise?
16   A    Everybody below him. He reported to Jim.
17   Q    Do you know a Wayne Kennard?
18   A    Yes.
19   Q    What is his position?
20      MR. CANDIELLO: Today?
21      MR. MARKOWITZ: Yes, today.
22   A    Human resource manager.
23 BY MR. MARKOWITZ:
24   Q    How about at the time of Dick's transfer, what
25 was his position?

```
TO:    DICK SKI                          CMF-MA-CL-DCS 11-Jun-99 13:20:58
       CFMF / CFD
       1 CAROLINA WAY
       CARLISLE              PA 17303

FROM: PETER FERGUSON                     CMF-MA-OO-PJF 10-Jun-99 10:50:09
       CFC / MCV
       405 CHURCH ROAD
       YORK                 PA 17402

SUBJECT: CLP LINEHAUL                    CMF-MA-CL-DCS/MA#9089967
```



To:  THOMAS PAULSEN - CFC/VP                          CMF-EO-OO-TXP
From: PETER FERGUSON                                  CMF-MA-OO-PJF
Date: Thursday 10-Jun-99 at 11:02am  (6:02am Local time)
Subject: CLP LINEHAUL
cc:   PATRICK J. BRADY                                CMF-NE-SM-PJB

PATRICK ASKED THAT I GIVE YOU A OVERVIEW OF THE PRESENT CLP L/H DEPT.
CURRENTLY WE ARE ATTEMPTING TO STAFF THE DEPT PROPERLY TO CURTAIL THE
VERY HIGH ATTRITION WE EXPERIENCED IN THE PAST 18 MONTHS. WE LOST 15
FRONT LINE SUPERVISORS IN LESS THAN 2 YEARS, MOSTLY TO ERRATIC
SCHEDULES, LONG HOURS AND EXTENDED WORK WEEKS NECESSARY TO COVER THE
SHORTFALL IN PEOPLE.

PRESENTLY WE ARE 3 PEOPLE SHORT OF MEETING OUR FULL COMPLIMENT OF
SUPERVISORS, WITH THE NW SHUTDOWN. WE HAVE 4 GOOD CANDIDATES FOR THESE
OPENINGS AND WILL BE MAKING A JOB OFFER TO THE BEST 3 BY TOMORROW OR
MONDAY, I EXPECT TO BE AT FULL COMPLIMENT BY MONDAY 6-21.

ONCE AT FULL COMPLIMENT I EXPECT TO SEE FURTHER AND SUSTAINED
IMPROVEMENTS IN HEALTH PAY AND THE COSTS.

TRAINING THESE NEW EMPLOYEES HAS PRIORITY, JEFF RICE HAS SET TRAINING
SCHEDULES TO AVOID THE OLD "LEARN BY YOUR MISTAKES" PROGRAM. ONCE
TRAINED, AND I EXPECT THE INITAL TRAINING NECESSARY TO GET THESES PEOPLE
FUNCTIONAL TO BE NO LATER THAN AUG 1, WE CAN BEGIN TO WEED OUT A FEW
UNDER-ACHIEVERS THAT WE HAVE HELD ON TO AND DO SOME CROSS TRAINING TO
STRENTHEN THE TEAM.

THE DOCK AND THE L/H DEPT WILL BE ON SIMILAR SCHEDULES, CAPABLE OF
PULLING ON FOR ABSENTION, ILLNESS AND VACATIONS WITHOUT LOSS OF
EFFICIENCY  USING A BANK DAY SCHEDULE TO COMP PEOPLE FOR EXTRA DAYS TO
GIVE TIME OFF THESE MEN WILL GET ALMOST THE SAME NUMBER OF DAYS IN A
YEAR THAT EMPLOYEES WORK ON THE 4 ON 3 OFF SCHEDULES AND HAVE REGULAR
ROTATIONS OF WEEKENDS OFF....THIS WAS A MAJOR ISSUE WITH EVERY EMPLOYEE
I CONVERSED OR TALKED TO IN THEIR INTERVIEW.

ALSO, ONCE PROPERLY STAFFED WE CAN MAKE A GOOD APPRAISAL OF THE PRESENT

                                                              Page    1
```

300062

"Exhibit E"

LINE HAUL MANAGEMENT, SET EVUALUATION CRITERIA AND GOALS TO REACH BY YEAR END.

WE STILL HAVE ABOUT 40-45 T/O'S TO HIRE, HOWEVER SINCE MARCH WE HAVE HAD A NET GAIN OF 8 T/O'S, HIRING 23 AND LOSING 15 TO RESIGNATION OR RETIREMENT. ADDITIONALLY WE HAVE ADDED 8 L/H POSITIONS BY BIDS THAT HAVE BEEN FILLED FROM THE QUALIFIED DOCKMEN AND ARE ADDING 2 MORE THIS WEEK. DURING THE LAST 120 DAYS WE HAVE HAD 188 APPLICANTS TO GET TO THE 23 ADDITIONS.

IN THE PENALTY PAY ARENA WE ARE BEGINNING TO SHOW SOME IMPROVEMENTS IN SPITE OF THE TURNOVER PROBLEMS.

THE FIRST 11 WEEKS OF 99 WE AVERAGED 20.2 MINUTES PENALTY PAY PER DISPATCH. FOR THE PAST 10 WEEKS WE AVERAGED 17.0 MINUTES, FOR A 16% IMPROVEMENT.

WITH EXPERIENCED PEOPLE, STABILITY, PROPER TRAINING AND THE RIGHT LEADERSHIP I AM EXPECTING TO REACH OF PENALTY PAY GOALS IN THE 4TH QUARTER.

```
.......... Routed on: Thu 10-Jun-99 at: 11:58am
      From: CMF-MA-OO-PJF PETER FERGUSON
        To: CMF-MA-CL-JLR JEFF RICE

.......... Routed on: Thu 10-Jun-99 at:  1:02pm
      From: CMF-MA-CL-JLR JEFF RICE
        To: CMF-MA-CL-CL4 CL4 PRINTER                    CCCC Printer

.......... Routed on: Fri  ...
```

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD C. WOJEWODZKI,          :
            PLAINTIFF            :
                                :
        VS                      :    NO.  1:CV01-285
                                :
CONSOLIDATED FREIGHTWAYS, INC., :
            DEFENDANT           :


DEPOSITION OF:  PETER J. FERGUSON

TAKEN BY:       PLAINTIFF

BEFORE:         SHERRY BRYANT, RMR, CRR
                NOTARY PUBLIC
DATE:           JANUARY 8, 2002, 10:15 A.M.
PLACE:          MORGAN, LEWIS & BOCKIUS
                417 WALNUT STREET
                HARRISBURG, PENNSYLVANIA


APPEARANCES:

    MARKOWITZ & KREVSKY, P.C.
    BY: LAWRENCE S. MARKOWITZ, ESQUIRE
        FOR - PLAINTIFF
    MORGAN, LEWIS & BOCKIUS
    BY: VINCENT CANDIELLO, ESQUIRE

        FOR - DEFENDANT
    GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

"Exhibit F"

**FERGUSON, PETER**
**01/08/02**

**WOJEWODZKI VS**
**CONSOLIDATED FREIGHTWAYS**

---

**22**

1 him about things that I was disappointed in. One of the
2 things that I referred to earlier was attrition. There was a
3 number of times that I asked Dick how many people have you
4 interviewed this week to fill the openings? None. You're X
5 amount of people short and you haven't interviewed one single
6 person? No, sir.
7       And I would go back to Jeff and tell him, you
8 better help him find some people, you better get a hold of
9 human resources, you better run some ads, you better go
10 through monster.com, whatever it's going to take. We had
11 Saturday sessions where we put leaflets out. We tried to
12 hold job fairs. We did a lot of things that were the result
13 of Jeff and I prodding people to do it as opposed to being
14 done as an original idea.
15 Q    Where was Dick sent to after this?
16 A    Initially, I put him down in Norristown.
17 Norristown was a terminal that was scheduled to be closed.
18 We were going through the transition of closing down the
19 operation and I had already moved the terminal manager to
20 Philadelphia where ultimately everybody was going to go, or I
21 shouldn't say everybody, 80 percent of the operation was
22 going to go. And I asked Dick to go down there to help
23 assist in that.
24 Q    In what position?
25 A    I think I just had him on special assignment.

---

**24**

1 going to be. And, again, I thought it was going to be
2 Baltimore, but it didn't turn out that way.
3 Q    So what did he end up doing in Norristown?
4 A    Well, he was working -- I guess I shouldn't
5 say this, but I really don't know everything he did every
6 day. I had him assigned to Frank Soper, who was a terminal
7 manager in Philadelphia. Frank was ultimately going to take
8 control of 80 percent of that operation. Frank was
9 spearheading the change. Frank was involved with both the
10 personnel changes and the administrative changes that were
11 going to be necessary to get that thing done.
12       And so I had him working with Frank. What
13 Frank assigned him to day in and day out, I really don't
14 know. But he was working in an administrative capacity,
15 certainly as a supervisor, but all of the details of what he
16 did day in and day out I couldn't tell you.
17 Q    When Dick left Carlisle, was he told anything
18 about what was going to be happening to his pay?
19 A    I don't know that. I don't know that -- I
20 mean I wasn't there when Jeff talked to him, so I don't know
21 that they had that conversation or not.
22 Q    Well, did you and Jeff have a discussion as to
23 whether Dick's pay would be protected whenever he moved?
24 A    No. I had him send me the 190, which is the
25 employee status form, and I -- as I said, I wasn't in a hurry

---

**23**

1 I mean I didn't change his title or his pay. I just asked
2 him to go down. And I wasn't quite sure what I was going to
3 do with Dick. Quite frankly, there was a time I thought I
4 would put him in Baltimore as a terminal manager, which
5 changed because of some things that I wasn't aware of at the
6 time. I mean I don't mean that in a secretive way, just that
7 things changed.
8 Q    What changed?
9 A    If I recall, the manager who was at Baltimore,
10 Brian Oliver, was being touted for a couple of positions, had
11 interviewed, and I thought he was going to leave. So I
12 thought there would be an opening in Baltimore. Ultimately
13 he declined those and it kind of surprised me that he didn't
14 take the opportunities to move. He had an offer to go to
15 both Texas and Florida and he turned them down. I thought he
16 was going to take one of the two jobs and there would be an
17 opening. He declined them and the opening never existed.
18 Q    Sure.
19 A    So -- but when I first removed Dick from that
20 job, I felt, probably still feel that Dick had a lot of skill
21 sets that he can use to be contributory to this company, but
22 I felt in the position he was in he wasn't going to be
23 successful. So I had no desire to get rid of him. I wanted
24 to put him someplace where he could be productive for a while
25 until I figured out where exactly the best spot for him was

---

**25**

1 to change his title or cut his pay. It wasn't an issue of
2 punishing him financially. It was an issue of getting a
3 round peg in a round hole, so to speak, and get Dick to where
4 he could be productive in my mind and get a person into the
5 line haul operation that could start to fulfill the duties
6 that I felt Dick should have been doing while he was there.
7 Q    And how did he do in Norristown?
8 A    To my knowledge, from the time he was
9 transferred to present, I haven't heard of any complaints of
10 his performance to speak of. I left not long thereafter,
11 kind of lost touch of what Dick was doing and what he was
12 assigned to, but in the short term he was in Frank Soper's
13 supervision and the little time that I was around while he
14 was back up in York, I didn't hear any real negatives about
15 Dick's performance.
16 Q    After Norristown where did Dick go to?
17 A    I think he did -- I think he helped us out a
18 little bit in Philadelphia once we went down there. I think
19 he worked there a few weeks. And -- but ultimately he ended
20 up back in York, Pennsylvania. York was a small domicile of
21 road drivers when I first came on board of about 40 drivers.
22       Over time I was -- I felt strongly that we
23 didn't need two driver boards that close together and that
24 they could be managed from one central location, meaning
25 Carlisle. However, York was still a reship center. They

---

## 46

1 the page you'll see for Pat Corson. What I'm getting at is
2 what is the difference between what does the regional
3 dispatch manager do and what the dispatch operations manager
4 does?
5    A   Well, they do no different than they had done
6 prior to the change in titles. Jim Kot is responsible under
7 his change to do exactly what Dick did 100 percent. And
8 Corson, under the change from an assistant DOM to a DOM, does
9 exactly the same. The reason that he was changed to a DOM
10 was twofold. One, part of it was merit and the fact that it
11 brought a $1,250 midpoint to the job, okay, as opposed to
12 making 1,050. And we knew that we were going to rely on
13 Corson to do some of the things that hadn't been done in the
14 past, and one of them was training and making sure that the
15 supervisors, that turnover was addressed.
16    Q   Which was also one of Dick's jobs?
17    A   Absolutely.
18    Q   So between the two of them, they were
19 basically taking over Dick's responsibilities?
20    A   No.
21       MR. CANDIELLO: Objection to the form.
22    A   That's not true. I said -- and Corson, when
23 Corson was an assistant DOM --
24 BY MR. MARKOWITZ:
25    Q   Right.

## 47

1    A   He did the same thing. He was responsible for
2 those things. He was -- in fact, he was given those
3 responsibilities by Dick himself. In Dick's absence he was
4 responsible for training. In Dick's absence, he was
5 responsible for the direct supervision of those front line
6 supervisors. So nothing really changed other than the title.
7    Q   Did one of them have a higher position than
8 the other?
9    A   Well, the term "ADOM" is an assistant. There
10 was --
11       MR. CANDIELLO: Objection to the form. Wait a
12 minute. Objection to the form. When you said did one of
13 them have a higher title than the other, who are the them
14 you're referring to?
15       MR. MARKOWITZ: Corson.
16       MR. CANDIELLO: Corson and?
17       MR. MARKOWITZ: And Kot.
18       MR. CANDIELLO: Okay.
19    A   Yes, certainly. Jim Kot was responsible for
20 the entire dispatch operation. In his absence, Pat Corson
21 would act exactly in the same manner as Jim Kot had he been
22 on site. And they act in tandem as a team. Jointly they
23 take on responsibilities, depending on the time of day
24 they're there and what's going on, to do training, whether
25 it's with supervisors or TOs, and to find solutions to

## 48

1 problems.
2       If you go back and discuss that with Pat
3 Corson, I'm sure he'll tell you he did exactly the same thing
4 with Dick. He followed Dick's lead on what his direction
5 should be to certain problems. And he did the same under the
6 guidance of Jim Kot and anybody else that came along after
7 Jim.
8 BY MR. MARKOWITZ:
9    Q   How did your turnover in personnel in Carlisle
10 compare to other CF facilities in your district?
11       MR. CANDIELLO: Objection to form. Turnover
12 in what group?
13       MR. MARKOWITZ: Turnover in supervisors.
14       MR. CANDIELLO: Which supervisors?
15       MR. MARKOWITZ: Line haul.
16       MR. CANDIELLO: Okay.
17    A   It was the highest I'd ever been associated
18 with.
19 BY MR. MARKOWITZ:
20    Q   Did you transfer any other assistant terminal
21 managers to other positions while you were in York?
22    A   I don't recall doing that.
23    Q   Did you ever specifically tell Dick that you
24 thought his leadership skills were lacking?
25    A   Yes.

## 49

1       MR. MARKOWITZ: I think that's all the
2 questions I have for you.
3
4          CROSS-EXAMINATION
5
6 BY MR. CANDIELLO:
7    Q   Mr. Ferguson, you indicated that you chatted
8 with Mr. Brady at the time you became the divisional manager
9 in the York area and asked him about the weaknesses and the
10 strengths in the division; is that correct?
11    A   Yes, all locations.
12    Q   And did you also speak to Mr. Conley about
13 that issue?
14    A   Yes. I only had one occasion to do so,
15 because he left pretty abruptly. He was on his way out as I
16 was on my way in.
17    Q   And Mr. Conley, where was his office located
18 when he was the division manager?
19    A   He wasn't the division manager.
20    Q   I'm sorry.
21    A   He was the terminal manager in Carlisle when I
22 came there.
23    Q   And so where did you speak to him?
24    A   In his office in Carlisle, Pennsylvania.
25    Q   Did you talk to him about strengths and

74

1  A     And the western area vice-president, which has
2  changed hands due to a death, was John Paiva. John passed
3  away suddenly and his replacement was Kevin Reilly. So we
4  stayed on while they went through that with the terminals in
5  our region.
6       So they'd start with Carlisle and then they'd
7  go down to Atlanta and they'd jump over to Charlotte and then
8  they'd go back up to Buffalo. And then I'd be done and I'd
9  drop off and they'd go to Chicago and Memphis and Nashville
10 and ask virtually the same questions.
11      And it was just a good rundown for the
12 condition of the operation for over the next eight hours and
13 it was a good opportunity for the president of the company,
14 who stays very closely tied to the operations, to ask
15 questions about are -- you know, if you're 20 drivers short,
16 are you hiring? If not, why not? Who have you got involved?
17 Is Kennard available? What kind of problems do you have
18 with, you know, not enough tractors?
19      I mean any number of operational issues or
20 personnel issues could come up. But that was the daily call
21 at 10. Even though we did a similar call at other times
22 during the day, the daily call at 10 was the one that got the
23 most notoriety.
24 Q     Who from Carlisle would be on the line?
25 A     Well, Jeff and the dispatch operation manager

75

1  or Dick, one of the two. And if Dick was off, had worked
2  nights, done something, it would either be him or Corson
3  typically.
4  Q     And who would generally answer the questions
5  for Carlisle, was that something Jeff would do or Dick?
6  A     Jeff would always answer the questions on the
7  dock side, and 90 percent of the line haul questions would be
8  answered by either Corson or Dick.
9  Q     The other thing in Mr. Candiello's questioning
10 of you, you used a term that you had open doors. What did
11 you mean by that?
12 A     Oh, at Carlisle we had about 40 doors on the
13 dock that weren't being used. So we had the capacity to
14 expand. That's why I called it. So we had some open doors
15 that we knew that if there was going to be expansion,
16 Carlisle was a good point to do that, because we had
17 capacity. There was doors that -- and to this day I think
18 we've still got about 20 of those doors that aren't in use
19 day in and day out. So...
20 Q     How many doors are there at Carlisle all
21 together?
22 A     200 plus.
23 Q     Okay.
24 A     So, you know, that escapes me. I think 240
25 sounds about...

76

1  Q     All I'm looking for is an estimate.
2  A     Yes.
3  Q     Just by comparison, how many doors are there
4  in a place like York?
5  A     110.
6  Q     Is York one of the bigger places in the --
7  A     No. Door-wise, Mira Loma, California is the
8  biggest, and I think they're pushing about 280 doors there.
9  Chicago's got 260 and I think Carlisle's at about 240.
10 Q     In the territory, though, that was under your
11 control, what was your second largest one?
12      MR. CANDIELLO: Objection to the form. You
13 mean when he was the division manager?
14      MR. MARKOWITZ: Right, right. Yes.
15 A     Oh, the division manager?
16 BY MR. MARKOWITZ:
17 Q     Yes.
18 A     Oh, as the division manager, there was no
19 comparison. It went from Carlisle at 240 down to York at 110
20 down to Philadelphia at 82 or 83.
21 Q     So York was the second biggest?
22 A     York was the second biggest in my division at
23 the time.
24 Q     So it was almost half?
25 A     Exactly. And went all the way down to

77

1 Portsmouth, Virginia, at three whopping doors. So we ran the
2 full gamut.
3      MR. MARKOWITZ: That's all the questions I
4 have.
5      MR. CANDIELLO: I have no further questions.
6      MR. MARKOWITZ: Thank you.
7      (The deposition was concluded at 12:26 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Consolidated

Freightways' Reply to Plaintiff's Memorandum of Law in Opposition to CF's Motion for

Summary Judgment has been served via U.S. Mail, postage prepaid, on this **1st Day of**

**April, 2002,** upon the following:

> Lawrence L. Markowitz, Esquire
> Markowitz & Krevsky, P.C.
> 208 E. Market Street
> P.O. Box 392
> York, PA  17405-0392

G. SCOTT PATERNO