

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RICHARD C. WOJEWODZKI, | : | CIVIL ACTION NO. 1:CV 01-285 |
| Plaintiff, | : | |
| | : | |
| v. | : | JUDGE SYLVIA H. RAMBO |
| | : | |
| CONSOLIDATED FREIGHTWAYS, INC., | : | |
| | : | |
| Defendant. | : | JURY TRIAL DEMANDED |

FILED
HARRISBURG, PA
JUN 1 7 2002
MARY E. D'ANDREA, CLERK
Per_____

**DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S**
**OBJECTIONS TO THE MAGISTRATE'S REPORT AND RECOMMENDATION**

Consolidated Freightways Corporation of Delaware (incorrectly named in the caption as Consolidated Freightways, Inc.) (hereinafter "CF"), through its attorneys, hereby submits its Supplemental Response to Plaintiff's Objections To The Magistrate's Report And Recommendations as ordered by this Court on June 3, 2002.

## I.   INTRODUCTION

On February 19, 2002, CF filed its Motion for Summary Judgment. The parties fully briefed the issues involved and submitted these briefs to Magistrate Judge Smyser. On April 10, 2002, Judge Smyser issued a report and recommendation that recommended granting CF's motion. On April 18, 2002, Plaintiff filed his objections to Judge Smyser's report and recommendations. On April 29, 2002, CF filed its Memorandum in Opposition to Plaintiff's objections, and on June 3, 2002, this Court ordered CF to provide a specific response to each of Plaintiff's objections.

## II.    ARGUMENT

Plaintiff raises three objections to the Magistrate's Report and Recommendation.

- Plaintiff objected to Fn. 1 on page 11 (Plaintiff's Objections ¶ 4);

- Plaintiff objected to Judge Smyser's conclusion that Mr. Ferguson's statement that Plaintiff "lacked leadership skills in the new age to help the company move forward" was not evidence of age discrimination (Plaintiff's Objections ¶ 5); and

- Plaintiff objected to Judge Smyser's conclusion that the facts in this case did not support an inference of age discrimination sufficient to withstand summary judgement (Plaintiff's Objections ¶ 6).

CF addresses each of these objections *seriatim*.

### A.    The Magistrate's Reference to Mr. Rice's Statements Is Harmless

Plaintiff contends Judge Smyser misapplied the hearsay rule by relying on certain statements Mr. Rice asserted Mr. Ferguson made.  Thus, Mr. Rice testified that Mr. Ferguson instructed him to "try to get line haul together because it's not running well" and to "determine whether [Plaintiff] was the right person for the job of directing Carlisle line haul."  Report and Recommendation at 11.  Plaintiff objects to the consideration of these statements because they are hearsay.  CF wonders whether Plaintiff complains too much as, even if these statements were ignored, it does not change the substance of Judge Smyser's report and recommendation.

Consequently, Plaintiff's objection should be overruled for two reasons: (1) this Court may rely on hearsay for the purpose of summary judgment when the testimony could be admitted at trial, and (2) whether the statements are hearsay is immaterial, as the statements themselves relate only to the legitimate business reason CF

articulated for Plaintiff's demotion. By way of explanation, CF offered the statements simply to show the consistency of its criticism regarding Plaintiff's inability to run the Carlisle line-haul department.

Under Third Circuit precedent, a trial court may consider hearsay testimony if there is a basis for the admission of the evidence at trial. See Blackburn v. UPS, Inc., 179 F.3d 81 (3d Cir. 1999); Williams v. Borough of West Chester, PA, 891 F.2d 458 (3d Cir. 1989). In Williams, the Third Circuit noted hearsay evidence "may be considered if the out-of-court declarant could later present that evidence through direct testimony, i.e., 'in a form that would be admissible at trial.'" Williams, 891 F.2d at 465 n. 12 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Here, the declarant is Mr. Ferguson, who would be available at trial to testify to the same statements.

Moreover, Mr. Ferguson addressed the same subject matter generally in his deposition:

> Well, [Mr. Rice and I] talked from **the first time I put [Mr. Rice] in that position** about every nuance of the operation from dock side to line haul. And so over that period of time between the time Jeff [Rice] came on board and the time we made the decision to change [Plaintiff], there had been some conversation about issues that we found to be a problem in line haul.

Ferguson Dep. at 21, attached as **Exhibit C.** Clearly, Mr. Ferguson's testimony demonstrates that Mr. Rice's hearsay statements will be admissible at trial, as they will emanate from the declarant. Mr. Ferguson's own testimony confirms his view that Plaintiff was unable to effectively manage the Carlisle line-haul department.

Moreover, CF offered the statements to demonstrate its legitimate business reason for demoting Plaintiff, which Plaintiff concedes. Plaintiff's Brief in Opposition to

Defendant's Motion for Summary Judgment ("Opp. Brief"), at 4. Thus, the issue for summary judgment is not whether CF articulated a legitimate business reason for Plaintiff's demotion, but, rather, whether Plaintiff can produce sufficient evidence to demonstrate pretext. Therefore, the objected to statements speak only to an issue rendered moot by Plaintiff's own response.

**B.  Plaintiff's Objection Regarding Alleged "Buzzwords For Age Discrimination" Should Be Overruled.**

After a plaintiff establishes a *prima facie* case and the defendant has articulated a legitimate business reason for the adverse employment action, the nature of the inquiry transforms:

> The plaintiff may then survive summary judgment or judgment as a matter of law by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)(internal citations omitted). Consequently, Plaintiff must satisfy one of the two prongs of the Fuentes test.

To that end, Plaintiff asserts Mr. Ferguson's statement that Plaintiff "lacked leadership skills in the new age to help the company move forward" is a buzzword for age discrimination and shows that illegal discrimination was the motivating factor in his demotion. However, this is based on an expansive definition of the phrase and ignores that the phrase did not even have this meaning to Plaintiff at the time he heard it, or even at the moment of Plaintiff's deposition.

Q:    So that I understand what [he] said as to the third reason, that you lacked leadership skills in the new age to take the company forward?

A:    Help the company go forward, yes.

Q:    When he used the phrase "new age," did you understand that phrase to have some specific significance in CF at the time?

A:    Well, when we did Carlisle in 1995, we opened up a new concept, okay. It was the quicker service, reduced service time. Get your percentages up. That was –

Q:    What percentages?

A:    The on-time percentages. And we were in a location right next to Route 81, which was a central highway that you can go either south or north from that location.

Q:    In connection with what you just said, was that described as a new age period?

A:    No, sir.

Q:    So, going back to my original question, is the phrase "new age" something that has peculiar significance to CF?

A:    I would say it would be the new programs that the company was going to instill, you know, to – either in the two-day fire lane or into any other program they were going to initiate.

Plaintiff's Dep., at 39-40, attached as **Exhibit D**. Thus, Plaintiff admitted the phrase "new age" referred to new innovations and improvements in efficiency at CF.

Given the foregoing, the labeling of the phrase "new age" as a buzzword for age discrimination is an argument and nothing more. Plaintiff fails to argue that any member of management at CF ever viewed the phrase in a demeaning manner. The words themselves are benign. Plaintiff's own interpretation presents a business focus in the use of the phrase.

Therefore, Plaintiff's resistance to summary judgment in such a manner fails to meet the requisites of Rule 56.

> Under Rule 56, Federal Rules of Civil Procedure, the moving party has the "burden of showing the absence of a genuine issue as to any material fact...." Adickes v. Kress & Co., 398 U.S. 144, 157 (1969). Rule 56(e) requires that "an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response . . . must set forth **specific facts** showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R.Civ.P. 56(e).

Gans v. Mundy, 762 F.2d 338, 340-341 (3d Cir. 1985). Furthermore, the Third Circuit maintains that "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." Gans, 762 F.2d at 341 (quoting Ness v. Marshall, 660 F.2d 517, 519 (3d Cir. 1981)).

Regardless, Plaintiff's adversarial twist to the phrase still is insufficient to thwart CF's motion for summary judgment. See Keller,130 F.3d at 1110 (a decision-maker's statement that, "if [Plaintiff is] getting too old for the job, maybe you should hire one or two young bankers," was insufficient to deny defendant's motion for summary judgment because it could only be construed by a reasonable fact finder as a weak inference of age discrimination given clear evidence of work performance deficiency). Here, the phrase "new age" equally is insufficient to avoid summary judgement given Plaintiff's admitted performance deficiency.

Here, Plaintiff only offers one statement that, in and of itself, has minimal probative value. Even Plaintiff himself did not interpret the comment as ageist at the

time he heard it.  Therefore, Plaintiff's position remains only an argument and nothing more.

But assuming the phrase "new age" operates to implicate a "mixed motive" analysis, CF demonstrated "that, even if [age] was a motivating factor in the adverse employment decision, it would have made the same employment decision in the absence of [discriminatory] animus."  <u>Walden v. Georgia-Pacific Corp.</u>, 126 F.3d 506. 512-513 (3d Cir. 1997).  Here, CF identified Plaintiff's continued and worsening problems with penalty pay; the high attrition rate of subordinates, and his lack of leadership skills, as well as the effect of those failings on CF's operations in terminals from Virginia to Maine.

Significantly, Plaintiff admits each of those performance deficiencies that prompted his demotion.  Thus, Plaintiff admits that, over the period from 1998 until his reassignment in 1999, the Carlisle line-haul department experienced the highest turnover of positions under his supervision.  Facts, at ¶ 43.  Plaintiff admits that, between 1997-1999, he did not meet CF's target for penalty pay.  Facts, at ¶¶ 44-45.  Specifically, for both 1998 and 1999, CF set the target for penalty pay at less than or equal to 12.3%.  In 1998, Plaintiff's penalty pay percentage was 14.3%; in 1999, it was 20.5%.  Facts, at ¶¶ 44-45.  Increased penalty pay is a direct cost to CF.

The inability to devise and implement a plan by which to correct line-haul's performance deficiencies was the lack of leadership skills to which Mr. Ferguson referred when he demoted Plaintiff.  Plaintiff's inability to turn line-haul around made his eventual removal inevitable.  As Mr. Ferguson explained:  "I called [Mr. Rice] and virtually said, okay, you know, I'm looking for an indicator that we're going to turn a

corner. It's just not there. You know, we can do this until Christmas, but we need to move on and I think we need to make a change." Ferguson Dep. at 20, attached at **Exhibit C.** Mr. Rice further explained:

> A:    It was basically – and this is to the best of my knowledge. On and off they kept asking is [Plaintiff] going to be able to turn it around. I said, yeah, I'm going to get him some people and we're going to give him an opportunity; with new supervisors and a schedule, I think we can get it done.
> Well, it never happened. And I got a call from [Mr. Ferguson] who said we can't do this anymore, you're going to have to make a change.
>
> Q:    Did he discuss with you whether you thought that was a good idea, or by the time he called was this a done deal?
>
> A:    At the time he called, I did give [Plaintiff] an opportunity to correct all of the problems. And I said [to Mr. Ferguson] at this point, I agree with you.

Rice Dep. at 26, attached as **Exhibit A.**

Plaintiff's removal from the Carlisle line-haul department is even more justified when the importance of the Carlisle terminal is considered. The Carlisle terminal was the most important terminal in the Northeast and Mid-Atlantic regions because of "the sheer magnitude of the operation." Facts, at ¶ 15. "Carlisle impacts every – or has the ability to impact every single shipment that [CF] delivers on the east coast from Virginia to Maine." Facts, at ¶ 15. Carlisle handled in excess of 120,000 shipments a month and is the biggest terminal by shipping volume in CF's system. Facts, at ¶ 17.

Furthermore, Plaintiff cannot identify another Assistant Terminal Manager with a high penalty pay rate as his that was not held accountable for the problem. Facts,

at ¶ 54. Even assuming the phrase "new age" was evidenced age discrimination, which CF denies, the evidence demonstrates CF would have demoted Plaintiff even in absence of the alleged discriminatory animus, based on Plaintiff's admitted performance deficiencies. Consequently, Plaintiff's objection should be overruled.

### C.    Judge Smyser Did Not Invade The Province Of The Jury

Plaintiff's last objection focuses on Judge Smyser's conclusion that the undisputed facts, when viewed in the light most favorable to the Plaintiff, do not create a sufficient inference of age discrimination. In opposition, Plaintiff lists several events in an attempt to demonstrate there were circumstances sufficient to support such an inference. Plaintiff bases his objection on seven events: (1) CF gave Plaintiff a favorable performance rating in April 1999; (2) he received a 3% Merit Increase in April 1999; (3) in June 1999, Mr. Ferguson sent an email saying Plaintiff's performance was improving; (4) Mr. Rice stated "he hated to lose him because he was a good worker but he was just following orders;" (5) Mr. Rice said he thought he was transferring Plaintiff to the terminal manager job in Norristown; (6) Mr. Ferguson stated he considered making Plaintiff the terminal manager in Baltimore; and (7) Mr. Ferguson assigned Plaintiff to be one of the Freight Operations Managers, which he alleges is a top management position at the York Terminal.

Jeff Rice addressed the first two issues in his deposition:

Q:    Did he receive any merit increases while you were there?

A:    Yes, he did.

Q:    If you were dissatisfied with his performance, why did he receive a merit increase?

A:     When I came in, I gave him an increase in good faith that we were going to turn this around. I think that was in March.

       *         *         *

Q:     In your evaluation of [Plaintiff], do you recall what, if anything, you criticized him for?

A:     All of the things we mentioned earlier, the inability to communicate, not being able to reach our numbers.

Q:     For penalty pay?

A:     Yes.

       *         *         *

Q:     Did you mention attrition in your evaluation of him?

A:     Yes.

Rice Dep. at 36-38, attached as **Exhibit A.**

Therefore, the increase was not a reward for performance that CF found acceptable. Rather, it was encouragement to achieve the performance levels to which CF held Plaintiff accountable. It certainly is not beyond human nature to try to encourage employees to achieve performance standards in gratitude for what a company already provides an employee. Wage adjustments are not just rewards for achievement of goals. At no time does Plaintiff explain the raise differently. No evidence was developed that Mr. Rice always gave raises for performance achievement as compared to performance encouragement.

More specifically and as previously noted, Mr. Rice did not give Plaintiff a "favorable" evaluation contrary to the criticisms on which his demotion was based. In fact, Mr. Rice's testimony made clear CF consistently recognized problems in Plaintiff's

specific oversight of the Carlisle line haul department in the categories in which it found him deficient.

Similarly, Plaintiff's depiction of Mr. Ferguson's e-mail that his performance was improving as an inference of age discrimination ignores the reality of the message. Specifically, the e-mail noted that, "[i]n the penalty pay arena we are beginning to show some improvement in spite of the turnover problems." However, the improvement was far from acceptable. Rather, the e-mail identifies Plaintiff's penalty pay rate as 17.0%, which was still significantly higher than CF's target of 12.3%. See **Exhibit B**; Facts, at ¶ 45. In short, minor improvement at the moment the e-mail was sent in no way contradicted Mr. Ferguson's later assessment that Plaintiff was not turning Carlisle line haul around.

Plaintiff also asserts that Mr. Rice stated "he hated to lose him because he was a good worker . . ." Opp. Memo at 5. Mr. Rice denies this statement. Rice Dep. at 33-34, attached as **Exhibit C.** But even assuming the veracity of Plaintiff's assertion, this statement does not demonstrate any inconsistency in CF's position. Mr. Rice's alleged comment is a general comment without explanation. Mr. Rice was not asked how it was that Plaintiff was a "good worker." Certainly, Mr. Rice was not opining that Plaintiff was good at penalty pay, attrition, or leadership in a large terminal like Carlisle as he specifically criticized Plaintiff in those categories while working at Carlisle. Furthermore, the alleged statement is consistent with CF's valuing Plaintiff in some other capacity. CF clearly valued Plaintiff's abilities – he remains employed with CF today. But being at work on time, all the time does not overcome Plaintiff's difficulties running the Carlisle line-haul department.

Finally, Plaintiff points to the positions he either was offered or for which CF considered him as evidence of pretext. Particularly, Plaintiff asserts that Mr. Rice's belief Plaintiff was being transferred to the terminal manager job in Norristown[1], Mr. Ferguson's statement that he considered assigning Plaintiff to the terminal manager position in Baltimore, as well as Plaintiff's actual assignment to the line-haul department in York, evidences an inconsistency in CF's proffered reason for removing Plaintiff. Plaintiff's assertions ignore the most important fact: each of these positions carried less responsibility than Plaintiff's former job.

The Carlisle terminal is the biggest terminal in the CF system when measured by shipping volume. Facts, at ¶ 17. The Carlisle terminal has 240 doors, or loading slots. Ferguson Dep. at 76, attached as **Exhibit C**. By comparison, the York terminal has 110 and the Philadelphia terminal has 83. Ferguson Dep. at 76, attached as **Exhibit C.**

In light of Carlisle's importance, Plaintiff's former job was more important and carried greater responsibility than any of the other positions he mentions. The first terminal, where Mr. Rice thought he was transferring Plaintiff to run the terminal, was in the process of being closed. Ferguson Dep. at 22, attached as **Exhibit C.** The position he was considered for in Baltimore had significantly less impact on CF's overall operations than the running the Carlisle line haul department. Facts, at ¶¶ 15-17. Plaintiff's final assignment, one of the four freight operations managers in the York terminal, also carried with it significantly less responsibility and impact on CF's

---

[1]    On March 28, 2002, Plaintiff's counsel confirmed via telephone that it was the Norristown terminal, not the Philadelphia terminal.

operations.  Thus, CF's actions were wholly consistent with Plaintiff's admitted

performance problems in line-haul at the Carlisle terminal.  He was considered for and

ultimately assigned to a position with significantly less responsibility but which utilized

the "skill set" Plaintiff possessed that CF felt could still be "contributory to this

company."  Ferguson Dep. at 23, attached as **Exhibit C.**

      Judge Smyser's determination that Plaintiff's alleged evidence of pretext

fails to provide a sufficient basis upon which a reasonable fact finder could disbelieve

CF's legitimate business reasons was correct.  Plaintiff's objection should be overruled

and summary judgment should be entered in favor of CF.

**III.**     **<u>CONCLUSION</u>**

      For the reasons set forth above, the reasons set forth in its Memorandum

of Law in Support of its Motion for Summary Judgment, and its Reply to Plaintiff's

Memorandum of Law in Opposition to CF's Motion for Summary Judgment, CF

respectfully requests that this Court deny Plaintiff's objections and accept Magistrate

Judge Smyser's recommendation granting CF's Motion for Summary Judgment.

                Respectfully submitted,

VINCENT CANDIELLO
G. SCOTT PATERNO
One Commerce Square
417 Walnut Street
Harrisburg, PA  17101-1904
717.237.4000

Of Counsel:
    **MORGAN, LEWIS & BOCKIUS LLP**
Dated:  June 17, 2002

Exh A

1
        IN THE UNITED STATED DISTRICT COURT
     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3
RICHARD C. WOJEWODZKI,       :
            PLAINTIFF    :
                     :

4
           VS          :  NO. 1:CVO1-285

5
CONSOLIDATED FREIGHTWAYS, INC., :
           DEFENDANT    :

6

7

8

9

10

11
               DEPOSITION OF:  JEFFREY L. RICE

12
               TAKEN BY:     PLAINTIFF

13
               BEFORE:       DONNA J. FOX, REPORTER
                              NOTARY PUBLIC

14
               DATE:         JANUARY 16, 2002, 1:00 P.M.

15
               PLACE:        MORGAN, LEWIS & BOCKIUS

16
                            417 WALNUT STREET
                            HARRISBURG, PENNSYLVANIA

17

18

19

20
APPEARANCES:

21
   MARKOWITZ & KREVSKY, P.C.
   BY:  LAWRENCE S. MARKOWITZ, ESQUIRE

22

23
           FOR - PLAINTIFF

24
   MORGAN, LEWIS & BOCKIUS
   BY:  VINCENT CANDIELLO, ESQUIRE

25
           FOR - DEFENDANT

1   best of your knowledge.

2       A        It was basically -- and this is to the best of

3   my knowledge.  On and off they kept asking is Dick going to

4   be able to turn around.  I said, yeah, I'm going to get him

5   some people and we're going to give him an opportunity; with

6   new supervisors and a schedule, I think we can get this

7   done.

8                Well, it never happened.  And I got a call

9   from Pete who said we can't go with this anymore, you're

10  going to have to make a change.

11      Q        Did he discuss with you whether you thought

12  that was a good idea, or by the time he called was this a

13  done deal?

14      A        At the time he called, I did give him an

15  opportunity to correct all of the problems.  And I said at

16  this point, I agree with you.

17      Q        He called to say get rid of him, and you said

18  I agree?

19      A        Right.

20               MR. CANDIELLO:  Objection to your

21  characterization.

22               MR. MARKOWITZ:  Let me recharacterize that.

23  BY MR. MARKOWITZ:

24      Q        Mr. Ferguson called to specifically tell you

25  to transfer Mr. Wojewodzki and you indicated to

```
 1        A        No.

 2        Q        Did you know what his duties were supposed to

 3  be in Norristown?

 4        A        No.

 5                 Can I add something?

 6        Q        Of course.

 7        A        I didn't know what his duties were, but I knew

 8  there was a terminal manager who was moved to Philadelphia.

 9  So I would assume that he would be running the terminal.

10        Q        Did Mr. Wojewodzki ask you if

11  Mr. Ferguson was behind the decision to move him to

12  Norristown?

13        A        I believe he did.  And I said, yes, but I said

14  I agreed with him.

15        Q        Did he box his items at that time?

16        A        Pardon me?

17        Q        Did Mr. Wojewodzki box his items at that time

18  when he --

19        A        That day?

20        Q        Yes.

21        A        No.  As a matter of fact, he said he would be

22  back on the weekend.

23        Q        During this meeting did you tell

24  Mr. Wojewodzki that you hated to lose him because he was a

25  good worker but you had to do what you were told?
```

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | Did you say anything like that? |
| 3 | A | I said exactly what I just told you. |
| 4 | Q | Did you tell him that you hated to lose him? |
| 5 | A | No. |
| 6 | Q | Did you discuss with him in any ways what his |

7  promotional opportunities might be in Norristown or
8  Philadelphia?

9     A     No.  I couldn't.  I couldn't speak on that
10 because I didn't know what his position was going to be.
11 And I do remember telling him that Pete was going to be
12 there on Tuesday and he could talk to Pete on Tuesday.

| 13 | Q | Pete would be in Norristown? |
|---|---|---|
| 14 | A | Yes. |
| 15 | Q | Had anyone been cross-trained to do Dick's job |

16 in line haul?

| 17 | A | No. |
|---|---|---|
| 18 | Q | Would he come in on vacation days to do work? |
| 19 | A | I've known him to come in on his vacation and |

20 do something, yes.

21    Q     Why do you think Mr. Wojewodzki was unable to
22 succeed as ATM in Carlisle?

23          MR. CANDIELLO:  Objection.  Calls for
24 speculation.  You may answer.

25    A     What was the question again?

1    Q        By take him out, did you understand that to

2    mean terminated or just put him elsewhere in the system?

3    A        To me it just meant taking him out and not

4    putting him anywhere.

5    Q        What are the factors that can contribute to

6    penalty pay rates being high?

7    A        Basically not being prepared when the drivers

8    come to report to work, not having work ready for them, not

9    knowing when your teams and your drivers are due into the

10   facility, especially say like a sleeper team or a team

11   coming in that you're paying double for; and you know

12   they're coming because they were on the reports but yet

13   we're not prepared for them when they get there.  So that's

14   all wait time.

15   Q        How about bad weather, would that also

16   influence it?

17   A        Bad weather can be planned for.  If it's bad

18   weather and we know they're not coming, there would be no

19   penalty pay.  Penalty pay is only when they are on the

20   facility.

21   Q        Did you ever do an annual review of Dick?

22   A        I did once when I went into Carlisle.

23   Q        Do you recall how he fared on that review?

24   A        I would think average.

25   Q        Did he receive any merit increases while you

```
1    were there?
2         A       Yes, he did.
3         Q       If you were dissatisfied with his performance,
4    why did he receive a merit increase?
5         A       When I came in, I gave him an increase in good
6    faith that we were going turn this around.   I think that was
7    in March.
8         Q       Are increases given just once a year?
9         A       Annual increases, yes.
10        Q       So he didn't miss any increases as a
11   punishment for not turning it around?
12        A       No.
13        Q       In your evaluation of Dick, do you recall
14   what, if anything, you criticized him for?
15        A       All of the things we mentioned earlier, the
16   inability to communicate, not being able to reach our
17   numbers.
18        Q       For penalty pay?
19        A       Yes.
20        Q       That's a yes?
21        A       Pardon me?
22        Q       That's a yes?
23        A       I'm sorry.   Yes.
24        Q       Did you mention attrition in your evaluation
25   of him?
```

38

```
1        A         Yes.

2        Q         Did you ever see an e-mail from Pete Ferguson

3   to Dick on June 16th, 1999, congratulating him for good

4   improvement in the line haul penalty-pay situation?

5        A         I can't recall.

6        Q         From the time that you took over to the time

7   that Mr. Wojewodzki was transferred, what was the trend in

8   penalty pay?  Was it upwards, downwards or staying the same?

9        A         Upward.

10       Q         How much upward?

11       A         I couldn't tell you.

12       Q         Did it ever go down at any time during that

13  period?

14       A         Yes.

15                 MR. CANDIELLO:  Which period?

16                 MR. MARKOWITZ:  The period from when he came

17  in to Carlisle to when Dick left.

18       A         Yes, because penalty pay came down weekly.

19  Actually, you could monitor it per day.

20  BY MR. MARKOWITZ:

21       Q         But if we looked at it on a monthly basis, was

22  he each month getting worse or were there some months where

23  there was actually improvement shown?

24       A         The answer to that question is sometimes it

25  was less but it was always over.
```

TO: DICK SKI
CMF / CPD
1 CAROLINA WAY
CARLISLE          PA 17063

CMF-MA-(   )DCS 11-Jun-99 13:2015B

*Exh B*

FROM: PETER FERGUSON          CMF-MA-00-PJF 10-Jun-99 10:5010S
CFC / MCV
405 CHURCH ROAD
YORK          PA 17402

SUBJECT: CLP LINEHAUL          CMF-MA-CL-DCS/MA#?082P67

To:    THOMAS PAULSEN - CFC/VP          CMF-EO-00-TXP
From:  PETER FERGUSON          CMF-MA-00-PJF
Date:  Thursday 10-Jun-99 at 11:02am (6:02am Local time)
Subject: CLP LINEHAUL
cc:    PATRICK J. BRADY          CMF-NE-SM-PUB

PATRICK ASKED THAT I GIVE YOU A OVERVIEW OF THE PRESENT CLP L/H DEPT.
CURRENTLY WE ARE ATTEMPTING TO STAFF THE DEPT PROPERLY TO CURTAIL THE
VERY HIGH ATTRITION WE EXPERIENCED IN THE PAST 18 MONTHS. WE LOST 15
FRONT-LINE SUPERVISORS IN LESS THAN 2 YEARS, MOSTLY TO ERRATIC
SCHEDULES, LONG HOURS AND EXTENDED WORK WEEKS NECESSARY TO COVER THE
SHORTFALL IN PEOPLE.

PRESENTLY WE ARE 3 PEOPLE SHORT OF MEETING OUR FULL COMPLIMENT OF
SUPERVISORS, WITH THE NU SHUTDO... WE HAVE 4 GOOD CANDIDATES FOR THESE
OPENINGSAND WILL BE MAKING A JOB OFFER TO THE BEST 3 BY TOMORROW OR
MONDAY. I EXPECT TO BE AT FULL COMPLIMENT BY MONDAY 6-21.

ONCE AT FULL COMPLIMENT I EXPECT TO SEE FURTHER AND SUSTAINED
IMPROVEMENTS IN REGARD TO SERVICE AND COSTS.

TRAINING THESE NEW EMPLOYEES HAS PRIORITY. JEFF RICE HAS SET TRAINING
SCHEDULES TO AVOID THE OLD "LEARN BY YOUR MISTAKES" PROGRAM. ONCE
TRAINED, AND I EXPECT THE INITAL TRAINING NECESSARY TO GET THESES PEOPLE
FUNCTIONAL TO BE NO LATER THAN AUG 1, WE CAN BEGIN TO WEED OUT A FEW
UNDER-ACHIEVERS THAT WE HAVE HELD ON TO AND DO SOME CROSS TRAINING TO
STRENTHEN THE TEAM.

THE DOCK AND THE L/H DEPT WILL BE IN SIMILAR SCHEDULES, CAPABLE OF
PULLING IN FOR ABSENTION,ILLNESS AND VACATIONS WITHOUT LOSS OF
EFFICIENCY. USING A BANK DAY SCHEDULE TO COMP PEOPLE FOR EXTRA DAYS TO
WORK TIME OFF THESE MEN WILL WORK ALMOST THE SAME NUMBER OF DAYS IN A
YEAR THAT EMPLOYEES WORK ON THE 4 ON 3 OFF SCHEDULES AND HAVE REGULAR
ROTATIONS OF WEEKENDS OFF...THIS WAS A MAJOR ISSUE WITH EVERY EMPLOYEE
I SURVEYED OR TALKED TO IN EXIT INTERVIEW.

ALSO, ONCE PROPERLY STAFFED WE CAN MAKE A GOOD APPRAISAL OF THE PRESENT

Page 1

300062

FERGUSON, PETER
01/08/02

COPY

Exh C

WOJEWODZKI VS
CONSOLIDATED FREIGHTWAYS

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD C. WOJEWODZKI,                    :
             PLAINTIFF                   :
                                  :
          VS                            :    NO.  1:CV01-285
                                  :
CONSOLIDATED FREIGHTWAYS, INC.,           :
             DEFENDANT                   :


DEPOSITION OF:  PETER J. FERGUSON

TAKEN BY:       PLAINTIFF

BEFORE:         SHERRY BRYANT, RMR, CRR
                NOTARY PUBLIC
DATE:           JANUARY 8, 2002, 10:15 A.M.
PLACE:          MORGAN, LEWIS & BOCKIUS
                417 WALNUT STREET
                HARRISBURG, PENNSYLVANIA


APPEARANCES:

    MARKOWITZ & KREVSKY, P.C.
    BY: LAWRENCE S. MARKOWITZ, ESQUIRE
       FOR - PLAINTIFF
    MORGAN, LEWIS & BOCKIUS
    BY: VINCENT CANDIELLO, ESQUIRE

       FOR - DEFENDANT
    GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

1    history hadn't gone to great lengths to find work anywhere.

2    Maybe Harrisburg is about the closest area, but they

3    certainly weren't going to go to York or Baltimore or

4    anywhere else to look for work.

5              So these were pretty good jobs, actually, for

6    the area and we didn't experience a great deal of turnover in

7    other positions.  And other locations even in cities like

8    Baltimore and Philadelphia had lower attrition rates, where

9    there was lots of competition.

10         Q         When did you make the final decision to

11   transfer?

12         A         I'd say late summer.  I don't remember the day

13   or the date.

14         Q         Who communicated that decision to him?

15         A         Jeff.  He worked for Jeff.  I called Jeff and

16   virtually said, okay, you know, I'm looking for an indicator

17   that we're going to turn a corner.  It's just not there.  You

18   know, we can do this until Christmas, but we need to move on

19   and I think we need to make a change.  And so timing, I can't

20   tell you the exact date, but I felt strongly that he worked

21   for Jeff and Jeff was the one that should confront him.

22         Q         What was Jeff's opinion about getting rid of

23   Dick?

24         A         He agreed with me.

25         Q         Did he say why he agreed with you?

1    A        Well, we had talked from the first time I put

2    him in that position about every nuance of the operation from

3    the dock side to line haul.  And so over that period of time

4    between the time Jeff came on board and the time we made the

5    decision to change him, there had been some conversation

6    about issues that we found to be a problem in line haul.

7             So I think it was a collective nature of Jeff

8    agreeing with me, not one specific issue but a number of

9    issues, and Jeff saw some of the same shortfalls that I had

10   seen.  And, you know, as we made changes and Jeff took a

11   little greater role in some of the things that went on in

12   line haul, we found that -- or it was my opinion I should

13   say, not we found, I found and my opinion was that there was

14   opportunity to make some improvements, but they weren't going

15   to happen under Dick's leadership.

16        Q        Now, Dick reported to Jeff, though; correct?

17        A        Yes.  Yes, he did.

18        Q        Did you ever have a discussion with Mr. Rice

19   that you were disappointed in him that he was not able to get

20   better performance out of Dick?

21        A        Several times, yes.

22        Q        Would that have been before or after Dick left

23   there?

24        A        Probably on a regular basis.  Every time we

25   talked about line haul, I'm sure I had a conversation with

22

1    him about things that I was disappointed in.  One of the

2    things that I referred to earlier was attrition.  There was a

3    number of times that I asked Dick how many people have you

4    interviewed this week to fill the openings?  None.  You're X

5    amount of people short and you haven't interviewed one single

6    person?  No, sir.

7              And I would go back to Jeff and tell him, you

8    better help him find some people, you better get a hold of

9    human resources, you better run some ads, you better go

10    through monster.com, whatever it's going to take.  We had

11    Saturday sessions where we put leaflets out.  We tried to

12    hold job fairs.  We did a lot of things that were the result

13    of Jeff and I prodding people to do it as opposed to being

14    done as an original idea.

15        Q         Where was Dick sent to after this?

16        A         Initially, I put him down in Norristown.

17    Norristown was a terminal that was scheduled to be closed.

18    We were going through the transition of closing down the

19    operation and I had already moved the terminal manager to

20    Philadelphia where ultimately everybody was going to go, or I

21    shouldn't say everybody, 80 percent of the operation was

22    going to go.  And I asked Dick to go down there to help

23    assist in that.

24        Q         In what position?

25        A         I think I just had him on special assignment.

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

23

1  I mean I didn't change his title or his pay.  I just asked

2  him to go down.  And I wasn't quite sure what I was going to

3  do with Dick.  Quite frankly, there was a time I thought I

4  would put him in Baltimore as a terminal manager, which

5  changed because of some things that I wasn't aware of at the

6  time.  I mean I don't mean that in a secretive way, just that

7  things changed.

8      Q        What changed?

9      A        If I recall, the manager who was at Baltimore,

10  Brian Oliver, was being touted for a couple of positions, had

11  interviewed, and I thought he was going to leave.  So I

12  thought there would be an opening in Baltimore.  Ultimately

13  he declined those and it kind of surprised me that he didn't

14  take the opportunities to move.  He had an offer to go to

15  both Texas and Florida and he turned them down.  I thought he

16  was going to take one of the two jobs and there would be an

17  opening.  He declined them and the opening never existed.

18      Q        Sure.

19      A        So -- but when I first removed Dick from that

20  job, I felt, probably still feel that Dick had a lot of skill

21  sets that he can use to be contributory to this company, but

22  I felt in the position he was in he wasn't going to be

23  successful.  So I had no desire to get rid of him.  I wanted

24  to put him someplace where he could be productive for a while

25  until I figured out where exactly the best spot for him was

76

```
 1        Q        All I'm looking for is an estimate.

 2        A        Yes.

 3        Q        Just by comparison, how many doors are there

 4   in a place like York?

 5        A        110.

 6        Q        Is York one of the bigger places in the --

 7        A        No.  Door-wise, Mira Loma, California is the

 8   biggest, and I think they're pushing about 280 doors there.

 9   Chicago's got 260 and I think Carlisle's at about 240.

10        Q        In the territory, though, that was under your

11   control, what was your second largest one?

12                 MR. CANDIELLO:  Objection to the form.  You

13   mean when he was the division manager?

14                 MR. MARKOWITZ:  Right, right.  Yes.

15        A        Oh, the division manager?

16   BY MR. MARKOWITZ:

17        Q        Yes.

18        A        Oh, as the division manager, there was no

19   comparison.  It went from Carlisle at 240 down to York at 110

20   down to Philadelphia at 82 or 83.

21        Q        So York was the second biggest?

22        A        York was the second biggest in my division at

23   the time.

24        Q        So it was almost half?

25        A        Exactly.  And went all the way down to
```

Exh D

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD C. WOJEWODZKI,                    :
                    PLAINTIFF             :
                                          :
            VS                            :        NO.  1:CV01-285
                                          :
CONSOLIDATED FREIGHTWAYS, INC.,           :
                    DEFENDANT             :


VOLUME 1

VIDEO
DEPOSITION OF:   RICHARD C. WOJEWODZKI

TAKEN BY:        DEFENDANT

BEFORE:          SHERRY BRYANT, RMR, CRR
                 NOTARY PUBLIC

                 TORR PIZZILLO, LEGAL
                 VIDEO SPECIALIST

DATE:            OCTOBER 31, 2001, 10:06 A.M.

PLACE:           MORGAN, LEWIS & BOCKIUS
                 417 WALNUT STREET
                 HARRISBURG, PENNSYLVANIA


APPEARANCES:

    MARKOWITZ & KREVSKY, P.C.
    BY: LAWRENCE S. MARKOWITZ, ESQUIRE

        FOR - PLAINTIFF

    MORGAN, LEWIS & BOCKIUS
    BY: VINCENT CANDIELLO, ESQUIRE

        FOR - DEFENDANT


GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

39

```
1        A        Again, I'm going to have to say Mr. McIntyre.

2    But it was another -- it was either Frank Soper or Dan

3    McIntyre who told me that Mr. Ferguson would see me on

4    Tuesday afternoon.

5        Q        When Mr. Ferguson met with you, in which

6    office did he see you?

7        A        The terminal manager's office.

8        Q        When he met with you, were the two of you

9    alone?

10        A        Yes, we were.

11        Q        Was the door shut?

12        A        Yes, sir.

13        Q        Tell me everything you remember coming out of

14    Mr. Ferguson's mouth and yours.

15        A        My first question was to ask Mr. Ferguson why

16    I was removed or reassigned from Carlisle, Pennsylvania to

17    Norristown, and he told me that there were three specific

18    reasons why he was going to say, you know, I was taken out or

19    reassigned.  He said first, he said the penalty pay in line

20    haul.  The second was the attrition of employees.  And the

21    third was that I lacked the leadership skills in the new age

22    to help the company go forward, which I assumed were

23    leadership responsibilities.

24        Q        So that I understood what you said as to the

25    third reason, that you lacked leadership skills in the new
```

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

1    age to take the company forward?

2         A        Help the company go forward, yes.

3         Q        When he used the phrase "new age," did you

4    understand that phrase to have some specific significance in

5    CF at the time?

6         A        Well, when we did Carlisle in 1995, we opened

7    up a new concept, okay.  It was the quicker service, reduced

8    service time.  Get your percentages up.  That was --

9         Q        What percentages?

10        A        The on-time performance.  And we were in a

11   location right next to Route 81, which was a central highway

12   that you can go either south or north from that location.

13        Q        In connection with what you just said, was

14   that described as a new age period?

15        A        No, sir.

16        Q        So, going back to my original question, is the

17   phrase "new age" something that has peculiar significance to

18   CF?

19        A        I would say it would be the new programs that

20   the company was going to instill, you know, to -- either in

21   the two-day fire lane or into any other program they were

22   going to initiate.

23        Q        At the time you heard this from Mr. Ferguson,

24   did you understand that to be the case or are you

25   speculating?

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Defendant's

Supplemental Response to Plaintiff's Objections to the Magistrate's Report and

Recommendation has been served via U.S. Mail, postage prepaid, on this **17th day of**

**June, 2002**, upon the following:

> Lawrence L. Markowitz, Esquire
> Markowitz & Krevsky, P.C.
> 208 E. Market Street
> P.O. Box 392
> York, PA  17405-0392

G. SCOTT PATERNO